# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-012

Filing Date: February 25, 2021

No. S-1-SC-37378

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LORENZO MARTINEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Fred T. Van Soelen, District Judge**

Released for Publication April 6, 2021.

Hector H. Balderas, Attorney General
Meryl E. Francolini, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**THOMSON, Justice.**

**{1}** Defendant Lorenzo Martinez asks this Court to reverse his convictions for first-degree murder and third-degree criminal sexual penetration (CSP) of the victim (Victim) after she died. NMSA 1978, § 30-2-1(A)(1) (1994); NMSA 1978, § 30-9-11(A) (2009). Defendant challenges his convictions on multiple grounds, most of which are controlled by precedent. However, we review one argument as a matter of first impression. Defendant's challenge to his CSP conviction requires us to determine whether a decedent constitutes a "person" as that term is defined and used in Section 30-9-11(A). Based on the following reasoning, we determine that Victim constitutes a person under

the unique circumstances of CSP in this case, and we hereby affirm Defendant's convictions.

## I.      BACKGROUND

{2}      At approximately 3:00 p.m. on February 13, 2017, Victim came over to Defendant's house, and they began to drink. Defendant had been acquainted with Victim for one year. Victim had been "bugging" Defendant for a "week and a half," and Defendant tried to avoid her that day. Defendant stated that he drank three beers and that Victim became intoxicated after consuming several shots and began to yell and get "out of control." Defendant attempted to quiet her due to concerns about violating his probation. Frustrated, Defendant went to the bathroom to shave, telling Victim to "shut up" as she continued to raise her voice.

{3}      After returning to the bathroom at approximately 6:00 p.m., Defendant reported that he "just . . . snapped." Defendant left the bathroom, retrieved a knife from the kitchen where Victim was seated on a chair, and said, "You know what girl? I've got a present for you." Victim responded, "What's that?" Defendant then stabbed her multiple times in the neck.

{4}      After killing Victim, Defendant went to his neighbor's house and calmly told her that there was a dead body in his house and that he killed Victim because "she was "irritating the shit out of him." According to Defendant, at approximately 7:00 p.m. he then moved her body to his bedroom, undressed her, and had sexual intercourse with her twice. He reported that he did not ejaculate. It is undisputed that Victim was deceased at the time of penetration. Defendant also admitted that he beat Victim in the face and stomach after moving her body to the bedroom.

{5}      After the murder and sexual penetration, Defendant called a mental health resources hotline to report the homicide. He also called the police and gave them a detailed statement of the events that took place. Defendant told police that he killed this "fucking, stupid-ass bitch who was annoying" him and that her body was lying on his bed. Over a recording, Defendant can be heard saying, "she just pissed me off and I killed her."

{6}      When the police came, they found Victim on Defendant's bed, naked from the waist down with breasts partially exposed. The police also found a pentagram on the wall that Defendant said he drew with Victim's blood. During the investigation, Defendant shared with police that he idolized serial killers and had wanted to kill someone for a long time but had not acted on previous homicidal ideations. He also stated that he would kill again if given the chance. Defendant further expressed how much he enjoyed killing Victim, describing the feeling as "pure joy."

{7}      The autopsy revealed that Victim suffered from one stab wound on the left side of her neck and at least eight stab wounds on the right side. Vaginal and anal swabs taken from the deceased Victim revealed no male DNA. Defendant was charged with first-degree murder, third-degree CSP, and third- or fourth-degree tampering with evidence.

**{8}** At trial, both sides called mental health experts to testify to Defendant's sanity. Defendant was diagnosed with the psychotic disorder of schizophrenia. This disorder is longstanding, and Defendant has experienced symptoms since he was nineteen years old. For much of his life, Defendant was often admitted to the hospital because he reported hearing voices that told him to harm himself or others, and he often experienced "command hallucinations" that ordered him to take his own life or the life of another person.

**{9}** Defendant's expert concluded that Defendant was insane at the time he killed Victim and that he acted in response to a command hallucination. He further testified that the circumstances on the day of Victim's murder differed from Defendant's previous command hallucinations due to the chaos and stress he experienced, explaining that schizophrenics are sensitive to environmental stimuli. The State's expert agreed that Defendant suffered from schizophrenia. However, he testified that Defendant demonstrated an ability to stop himself from acting on command hallucinations in the past and thus could have stopped himself from stabbing Victim.

**{10}** The jury ultimately found Defendant to be sane and convicted him of first-degree murder and third-degree CSP. The district court sentenced him to life in prison. He now asserts his right to directly appeal both of his convictions pursuant to Rule 12-102(A)(1) NMRA (directing that appeals from the district courts in which a sentence of life imprisonment is imposed are taken to the Supreme Court).

## II.    DISCUSSION

**{11}** Defendant challenges his CSP conviction on four grounds: (1) most significantly, Victim was dead before the alleged CSP, and thus he could not have violated Section 30-9-11; (2) the district court erred by instructing the jury that it could convict even if Victim was deceased at the time of penetration; (3) his punishment for both CSP and first-degree murder violates double jeopardy; and (4) there was insufficient evidence of CSP because there was no physical evidence that corroborated his confession. Defendant also challenges the sufficiency of the evidence that supports his first-degree murder conviction. He asserts that the State presented insufficient evidence of deliberation and also failed to prove that he was sane, or capable of controlling himself, when he killed Victim and when he later sexually penetrated her body. For the reasons stated herein, we affirm both of Defendant's convictions.

### A.    CSP Conviction

**{12}** Defendant presents four challenges to his conviction for third-degree CSP. We take each in turn.

### 1.    Legal Sufficiency

**{13}** Concerning whether the crime of CSP requires the victim to be alive at the time of penetration, the statute provides, "Criminal sexual penetration is the unlawful and intentional causing of *a person* to engage in sexual intercourse, cunnilingus, fellatio, or anal intercourse or the causing of penetration, to any extent and with any object, of the

genital or anal openings of another, whether or not there is any emission." Section 30-9-11(A) (emphasis added). It further provides that third-degree CSP is "all criminal sexual penetration perpetrated through the use of force or coercion not otherwise specified in this section." Section 30-9-11(F). Defendant argues that the Legislature's use of the term "person" in the statute requires that the victim be alive at the time of penetration. Thus, Defendant contends, the crime of CSP is a legal impossibility in this case because Victim was no longer alive.

**{14}**   In resolving matters such as this, we review de novo questions of statutory interpretation. *State v. Almanzar*, 2014-NMSC-001, ¶ 9, 316 P.3d 183. New Mexico's principles of statutory construction instruct that "[t]he text of a statute or rule is the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997). However, "[i]n addition to looking at the statutory language, we also consider the history and background of the statute," and "[t]he plain meaning rule must yield when equity, legislative history, or other sources demonstrate that applying the plain meaning would result in a construction contrary to the spirit of the statute." *GandyDancer, LLC v. Rock House CGM, LLC*, 2019-NMSC-021, ¶¶ 13-14, 453 P.3d 434 (internal quotation marks omitted) (quoting *State v. Smith*, 2004-NMSC-032, ¶¶ 9-10, 136 N.M. 372, 98 P.3d 1022).

**{15}**   The parties apply the test articulated in *State v. Montoya*, 2017-NMCA-033, 392 P.3d 223, in support of their respective answers to the question presented. In *Montoya*, the defendant robbed and killed the victim, left the scene, and then returned hours later to empty the victim's pockets and set fire to the victim's home with the body inside. *Id.* ¶ 2. The Court of Appeals upheld a conviction for the second robbery of the dead body, because "the second robbery and the subsequent arson were 'clean-up' activities directly connected with the original robbery and killing, and therefore the second robbery *can rationally be linked* to the murder that enabled the robbery." *Id.* ¶ 8 (emphasis added). Here, Defendant argues that the CSP was not rationally linked to the murder, and the State argues that it was.

**{16}**   Because of the distinctions between the purpose and intent of the robbery and CSP statutes, we decline to extend the *Montoya* test to our analysis of the CSP statute. *Compare* NMSA 1978, § 30-16-2 (1973) (Robbery), *with* § 30-9-11 (CSP). Instead, a clearer path to resolving this question is determining the meaning of the word "person" pursuant to Section 30-9-11(A) in conjunction with the purpose and intent of this specific CSP statute.

**{17}**   When used within the New Mexico Criminal Code, *person* is defined as "any human being or legal entity, whether incorporated or unincorporated, including the United States, the state of New Mexico or any subdivision thereof." NMSA 1978, § 30-1-12(E) (1963). Similarly, *Black's Law Dictionary* 1376 (11th ed. 2019) defines *person* as a "human being." The term *human being* is not used in the CSP statute, but it appears that the Legislature has used the term to describe both a living *and* a deceased person. *Compare* NMSA 1978, § 30-12-13 (1989) (prohibiting defacing of the "place of burial of any human being"), *with* NMSA 1978, § 30-2-3 (1994) ("Manslaughter is the unlawful killing of a human being without malice.").

**{18}** Because the CSP statute, § 30-9-11, does not specify whether the word "person" in Subsection A includes a deceased person in the context of criminal sexual penetration, we look next to the statute's "obvious spirit or reason." *See State v. Boyse*, 2013-NMSC-024, ¶ 9, 303 P.3d 830 (internal quotation marks and citation omitted). We conclude, consistent with precedent, that based on its plain meaning, the purpose of the CSP statute is to protect against forcible, nonconsensual sexual penetration of a person's body.

**{19}** We have previously determined that "[t]he felonious purpose of CSP—other than to injure the victim—can be described as the imposition of sexual activity on those who are not willing participants in fact or in law." *State v. Marquez*, 2016-NMSC-025, ¶ 20, 376 P.3d 815 (internal quotation marks omitted) (quoting *State v. Stevens*, 2014-NMSC-011, ¶ 38, 323 P.3d 901). That is, "The legislative intent underlying CSP is the protection of people from unlawful intrusions into enumerated areas of the body." *Id.* ¶ 20. Similarly, the Court of Appeals has also concluded that "the legislatively-protected interest under the CSP and [criminal sexual contact] statutes is the bodily integrity and personal safety of the individual." *State v. Williams*, 1986-NMCA-122, ¶ 9, 105 N.M. 214, 730 P.2d 1196. "The CSP sanction was to prevent forcible, *nonconsensual* sexual activity and to protect a person's important interests in *uncoerced* choice of sexual partners." *State v. Jensen*, 2005-NMCA-113, ¶ 8, 138 N.M. 254, 118 P.3d 762 (emphasis added) (internal quotation marks and citation omitted). Our reading is consistent with the clear legislative intent to protect a victim's bodily integrity from unlawful, coerced intrusions.

**{20}** The heart of the question therefore rests on whether, under any circumstances, the protections defined in the CSP statute terminate upon death. To answer this question, we turn to an analysis of whether the statutory meaning of "the use of force or coercion" may be read to include killing someone. *See* § 30-9-11(F). "[F]orce or coercion" is defined in part as "the use of physical force or physical violence," "the use of threats," and "the perpetration of criminal sexual penetration or criminal sexual contact when the perpetrator knows or has reason to know that the victim is unconscious, asleep *or otherwise physically helpless* . . . ." NMSA 1978, § 30-9-10(A)(1), (2), (4) (emphasis added).

**{21}** Defendant incorrectly argues that Section 30-9-10(A) "provides an exhaustive list of circumstances when force or coercion is used against someone unable to physically consent." The statute makes clear that "[p]hysical or verbal resistance of the victim is not an element of force or coercion." Section 30-9-10(A). Thus, the use of force or coercion is inherent in the sexual penetration of a victim who is unable to consent. Rather than excluding additional forms of incapacitation as stated by Defendant, we apply the canon of statutory construction ejusdem generis, meaning *of the same kind*, in concluding that the statutory term "or otherwise physically helpless" was intended to provide for the limited inclusion of other forms of incapacitation not previously listed. *See State v. Off. of Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶ 29, 285 P.3d 622 (describing ejusdem generis as requiring "that where general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to

persons or things of the same kind or class as those specifically mentioned" (internal quotation marks and citation omitted)); *see also* NMSA 1978, § 12-2A-20(A)(2) (1997) ("[T]he meaning of a general word or phrase following two or more specific words or phrases may be limited to the category established by the specific words or phrases.").

**{22}** Although the Court has never directly addressed this issue, other jurisdictions have predominately concluded that a victim need not be alive to uphold a CSP conviction. Several of these states base their reasoning, as we do, in death as a form of incapacitation. *See, e.g.*, *Lipham v. State*, 364 S.E.2d 840, 842-43 (Ga. 1988) ("'[A]gainst her will' has been interpreted to mean 'without her consent,' and has been satisfied in cases in which the victim was drugged, asleep, unconscious, or in a coma. We see no reason why it should be any less applicable in a case in which the defendant has rendered the victim permanently unconscious by killing her." (citation omitted)). In *State v. Grunke*, the court reasoned that nonconsent "is subject to simple proof when the victim is a corpse." 2008 WI 82, ¶ 25, 752 N.W. 2d 769; *see also State v. Brobeck*, 751 S.W. 2d 828, 832 (Tenn. 1988) (concluding that reading "'live only' into the statute encourages rapists to kill their victims"); *State v. Solek*, 783 A.2d 1123, 1131 (Conn. App. Ct. 2001) ("Clearly, a person who is deceased is physically unable to communicate an unwillingness to act."); *State v. Collins*, 585 N.E.2d 532, 535 (Ohio Ct. App. 1990) ("[T]he fact that the victim may have been dead when the [criminal] sexual conduct occurred does not, in itself, lessen the defendant's culpability.").

**{23}** It is critical to articulate that the CSP statute, § 30-9-11, extends protections to victims who are unable to express consent. We therefore determine that it would be contrary to the spirit of the statute to exclude victims who were unable to consent or resist solely because the perpetrator "rendered the victim permanently unconscious" by killing the victim. *See Lipham*, 364 S.E.2d at 842. This is true even when the murder was not committed in direct furtherance of the CSP. Therefore, in circumstances where the perpetrator rendered the victim physically helpless by killing the victim before committing the CSP, the deceased victim is a legal person for the limited purpose of applying the CSP statute. As in situations where the perpetrator causes a victim to become unconscious through violent means or by deliberate incapacitation using drugs or alcohol before committing CSP, the perpetrator may not then benefit from the victim's inability to consent. Any other result would be contrary to the purpose and intent of the statute to protect victims from forcible sexual penetration that they did not, or could not, consent to. We therefore affirm Defendant's conviction.

**{24}** Further, ensuring that the law affords due respect and dignity to the dead in cases where the body of a dead person is sexually penetrated or otherwise used for sexual purposes where the perpetrator did not first kill the victim is a responsibility that we invite the Legislature to undertake. At this time, New Mexico law does not prohibit the act of necrophilia or abuse of a corpse.

## 2. The district court's jury instruction was not error

**{25}** Defendant objected to all the CSP jury instructions at trial, preserving these for review on appeal. Defendant also argued that the district court improperly instructed the

jury that a deceased person may qualify as a victim and asks this Court to remand for a new trial with a "properly instructed jury." We review preserved jury instructions for reversible error. *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. In doing so, this Court seeks to determine "whether a reasonable juror would have been confused or misdirected" by the challenged jury instruction. *State v. Cunningham*, 2000-NMSC-009, ¶ 4, 128 N.M. 711, 998 P.2d 176, (internal quotation marks omitted) (quoting *State v. Parish*, 1994-NMSC-073, ¶ 4, 118 N.M. 39, 878 P.2d 988). "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Benally*, 2001-NMSC-033, ¶ 12.

{26}    The district court instructed the jury that CSP "requires a live victim at the time of penetration because a dead body is not a person unless you are unanimously satisfied beyond a reasonable doubt that the [CSP] was *linked* to the [m]urder of [Victim]." (Emphasis added.) Although the jury instruction reflects the test articulated in *Montoya* and not the rule announced herein, we nonetheless hold that it was not error. Because the jury was instructed on and convicted Defendant of first-degree murder and was instructed on all elements of third-degree CSP, we conclude that a reasonable juror would not have been confused or misdirected by the challenged instruction. The verdict is consistent with the outcome mandated under the rule we have presently announced.

### 3.    Defendant's convictions do not violate double jeopardy

{27}    Next, Defendant argues that his convictions for CSP and first-degree murder violate double jeopardy, constituting a "double description" case. A "double-description" double jeopardy violation can occur when the same conduct results in multiple convictions under different statutes. *State v. Torres*, 2018-NMSC-013, ¶ 16, 413 P.3d 467.

{28}    With regard to our newly announced rule articulating when a deceased person is a victim pursuant to the CSP statute, Defendant's convictions rest on unmistakably distinct conduct. Defendant's conviction for first-degree murder is based on his act of stabbing Victim to death, while the CSP conviction is based on his subsequent nonconsensual sexual penetration of Victim. There is also sufficient evidence that these offenses were temporally distinct because the record clearly establishes that the killing of Victim was completed at least one hour before the sexual penetration took place. This Court's holding therefore does not invoke the question of double jeopardy.

### 4.    The State sufficiently established the corpus delicti of CSP

{29}    Finally, Defendant argues that the State failed to present sufficient evidence that he committed CSP because it failed to establish the corpus delicti, or *body of the crime*. The corpus delicti rule requires the State to produce some evidence that a crime has been committed, in addition to "extrajudicial confessions or admissions of the accused," to support a conviction. *State v. Weisser*, 2007-NMCA-015, ¶ 10, 141 N.M. 93, 150 P.3d 1043 (internal quotation marks and citation omitted), *abrogated on other grounds as*

*recognized by State v. Bregar*, 2017-NMCA-028, ¶ 49, 390 P.3d 212. This rule has evolved throughout our judicial history "to prevent the conviction of those who confessed to non-existent crimes as a result of coercion or mental illness." David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L.J. 817, 817 (2003).

**{30}** Despite its compelling purpose, many state and federal courts no longer apply the traditional corpus delicti rule due to concerns that it had become merely a "doctrinal obstacle[] whereby the guilty can escape just punishment." *State v. Wilson*, 2011-NMSC-001, ¶ 10, 149 N.M. 273, 248 P.3d 315 (alteration in original) (internal quotation marks omitted) (quoting *State v. Harris*, 575 A.2d 223, 227 (Conn. 1990)), *overruled on other grounds b*y *State v. Tollardo*, 2012-NMSC-008, ¶ 37 & n.6, 275 P.3d 110. In *Opper v. United States*, the Supreme Court considered "the extent of the corroboration of admissions necessary as a matter of law for a judgment of conviction." 348 U.S. 84, 92 (1954). There, the Supreme Court supplanted the traditional corpus delicti rule with a modified trustworthiness doctrine. *Opper*, 348 U.S. at 93 ("[T]he independent evidence . . . is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth."). "The federal trustworthiness doctrine differs from the traditional *corpus delicti* rule in that it emphasizes the reliability of the defendant's confession over the independent evidence of the corpus delicti." *Wilson*, 2011-NMSC-001, ¶ 11 (internal quotation marks and citation omitted).

**{31}** New Mexico applies a modified trustworthiness rule: "[A]n extrajudicial statement may be used to establish the corpus delicti where the statement is shown to be trustworthy and where there is some independent evidence to confirm the existence of the alleged loss or injury." *Weisser*, 2007-NMCA-015, ¶¶ 17-18 (reviewing the rule announced in *State v. Paris*, 1966-NMSC-039, ¶¶ 11, 13, 76 N.M. 291, 414 P.2d 512). Although subsequent decisions raised questions as to whether *Paris* was still the correct standard, the *Paris* rule was ultimately adopted by the Court of Appeals in *Weisser*, 2007-NMCA-015, ¶ 25, and by this Court in *Wilson*, 2011-NMSC-001, ¶ 16. Now, "[u]nder New Mexico's modern approach, a defendant's extrajudicial statements may be used to establish the corpus delicti when the prosecution is able to demonstrate the trustworthiness of the confession and introduce some independent evidence of a criminal act." *Wilson*, 2011-NMSC-001, ¶ 15 (citing *Weisser*, 2007-NMCA-015, ¶ 18). "This independent evidence can consist of either 'direct or circumstantial evidence, but such evidence must be independent of a defendant's own extrajudicial statements.'" *State v. Bregar*, 2017-NMCA-028, ¶ 46, 390 P.3d 212 (quoting *Weisser*, 2007-NMCA-015, ¶ 12).

**{32}** "We review de novo any claim that the State failed to prove the corpus delicti of the charged offense, but we take all findings of fact that support a conviction as given if supported by substantial evidence." *Id.*; *see also Wilson*, 2011-NMSC-001, ¶ 17. Additionally, "where the determination of the corpus delicti rests on disputed facts, we will defer to the district court's findings of fact, provided that such findings are supported by substantial evidence." *Weisser*, 2007-NMCA-015, ¶ 7 (citing *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856).

**{33}** Here, Defendant argues that the State did not prove the corpus delicti of the crime and asserts that the only evidence of CSP was Defendant's own statement. No male DNA was detected on vaginal and anal swabs taken from Victim to corroborate Defendant's confession. The State, however, argues that the corpus delicti is satisfied by independent physical evidence, despite the lack of DNA evidence, and points to the postmortem condition of Victim's body lying on the bed, naked from the waist down with her breasts exposed. The State further asserts that Victim's position on Defendant's bed was "consistent with sexual intercourse."

**{34}** Here, this Court recognizes that Defendant's uncontested schizophrenia diagnosis likely places him in the category of defendants that the corpus delicti rule was historically enacted to protect. However, this is not a case "where the defendant's confession is so unreliable that there is little or no evidence other than the confession that a crime has occurred at all." Moran, *supra*, at 819. Additionally, this case is distinguishable from *Weisser*, where the Court concluded that the corpus delicti was not met because the only evidence of the crime in addition to the defendant's statements was that the child he confessed to having sexual contact with displayed two out of twelve symptoms corroborative of sexual abuse. 2007-NMCA-015, ¶ 4. Here, the independent circumstantial evidence is highly corroborative of Defendant's statement of events, including his report of moving Victim to his bedroom and his subsequent acts. Although the independent evidence presented to satisfy corpus delicti must be assessed on a case-by-case basis when there is no DNA evidence to corroborate a defendant's statement, with regard to this case we conclude that the postmortem condition and location of Victim's body is sufficient to corroborate the truthfulness of Defendant's statements. We accordingly reject Defendant's corpus delicti challenge.

## B.     First-Degree Murder Convictions

**{35}** We next address Defendant's argument that there was insufficient evidence of his sanity followed by his argument that there was insufficient evidence of deliberation to support his first-degree murder conviction. *See State v. Fekete*, 1995-NMSC-049, ¶¶ 1-2, 15, 28, 52, 120 N.M. 290, 901 P.2d 708 (affirming a schizophrenic defendant's conviction of first-degree murder, addressing the defendant's challenges that included insufficient evidence of his deliberate intent and the district court's refusal to instruct the jury, as requested by the defendant, on diminished capacity from drug withdrawal and on the verdict of "not guilty by reason of insanity").

## 1.     Standard of review

**{36}** When reviewing the sufficiency of the evidence, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted). "New Mexico appellate courts will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] its judgment for that of the jury." *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (alterations in original) (internal quotation marks and citation omitted). "Although our review never

serves as a substitution for the jury's fact-finding role, it is our duty to scrutin[ize] . . . the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for conviction." *State v. Tafoya*, 2012-NMSC-030, ¶ 36, 285 P.3d 604 (alteration in original) (omission in original) (internal quotation marks omitted) (quoting *State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862). In addition, we view "the evidence in a light most favorable to the prevailing party." *Weidler v. Big J Enters., Inc.*, 1998-NMCA-021, ¶ 30, 124 N.M. 591, 953 P.2d 1089 (internal quotation marks and citation omitted).

## 2.  Defendant's insanity defense

**{37}**  Defendant asks this Court to hold that the State failed to present sufficient evidence that he was sane at the time the crimes were committed. In any criminal case, there is an initial presumption that a defendant is sane. *See State v. Dorsey*, 1979-NMSC-097, ¶ 3, 93 N.M. 607, 603 P.2d 717. However, a defendant may rebut the presumption of sanity by introducing evidence to support an allegation of insanity. *Id*. ¶ 3. "To rebut the presumption of sanity a defendant must only introduce some competent evidence to support the allegation of insanity." *State v. Lopez*, 1978-NMSC-060, ¶ 4, 91 N.M. 779, 581 P.2d 872 (citing *State v. Hartley*, 1977-NMSC-043, ¶ 7, 90 N.M. 488, 565 P.2d 658). Once a defendant rebuts the presumption, "[t]he burden then shifts to the State to prove beyond a reasonable doubt that defendant was sane at the time the act was committed." *Id.* However, "the state [is] not required to affirmatively prove sanity but could rather rely on the presumption." *State v. Wilson*, 1973-NMSC-093, ¶ 19, 85 N.M. 552, 514 P.2d 603.

**{38}**  The district court instructed the jury that the State was required to prove beyond a reasonable doubt that Defendant was sane at the time the crimes were committed. The jury instruction on sanity directed that the Defendant should be considered "insane at the time of the commission of the crime if, because of a mental disease, . . . [Defendant] did not know what he was doing or understand the consequences of his act; or did not know that his act was wrong; or could not prevent himself from committing the act." The only element at issue here is whether Defendant should have been found insane because he "could not prevent himself from committing the act."

**{39}**  Our legal tradition has long espoused that, with regard to insanity, "[o]ur collective conscience does not allow punishment where it cannot impose blame." Jonas Robitscher Andrew & Andrew Ky Haynes, *In Defense of the Insanity Defense*, 31 Emory L.J. 9 (1982) (alteration in original) (internal quotation marks omitted) (quoting *Durham v. United States*, 214 F.2d 862, 876 (D.C. Cir. 1954), *abrogated on other grounds by United States v. Brawner*, 471 F.2d 969 (D.C. Cir. 1972)). It is uncontested that Defendant is schizophrenic, and the record clearly establishes that Defendant lived with this mental illness, often requiring medical treatment, for decades of his life. However, "[a] person is not legally insane simply because he suffers from schizophrenia," and defendants suffering from mental illness may still retain agency over their actions for purposes of determining sanity.

> An insanity defense is commonly provided when a mental disease or defect impairs an actor's ability to control his conduct to such an extent that he can no longer be fairly held accountable for it.
>
> . . . Impairment of control . . . is the least dramatic, least compelling excusing condition because all persons are regularly exposed to pressures and temptations to engage in prohibited conduct. Each of us is expected to resist these pressures and temptations. But, if an actor can demonstrate that his mental illness created a sufficient compulsion or sufficiently impaired his ability to resist the prohibited conduct, then the actor should be and generally is excused. He has distinguished his lack of control from a [nonmentally ill] person's failure to control his self-gratifying or self-serving urges.

Paul H. Robinson et al., 2 Crim. L. Def. § 173(e)(1), (3) at 301 (1984 and Supp. 2020) (footnotes omitted). Thus, this case questions whether Defendant's actions were the result of the command hallucinations as symptoms of schizophrenia that he was unable to resist, or of his own volition in furtherance of self-gratification.

**{40}**　Defendant argues that he rebutted the presumption of sanity when Defendant's expert testified that Defendant was insane at the time of the murder and was not able to prevent himself from committing the act because of a strong command hallucination he experienced at the time. The State's expert testified that Defendant could have prevented himself from committing the crimes, and was thus sane, based on Defendant's calm demeanor and statements made subsequent to the acts. The State's expert also opined that Defendant's ability to overcome past command hallucinations and control himself made it more likely that he could have prevented himself from killing Victim in this case**.**

**{41}**　Although there was ample evidence of Defendant's schizophrenia diagnosis and mental illness, whether he could have prevented himself from committing the acts is disputed by the party's experts. It is a well-settled notion that where the evidence is disputed, it poses a question of fact best decided by the jury. Further, "[i]f the jury . . . disbelieves the evidence, then the presumption stands." *Id.*

**{42}**　Here, after hearing from both experts, the jury determined that Defendant could have prevented himself from acting and was therefore sane. We conclude that the State has met its burden by presenting evidence sufficient for a reasonable juror to find that Defendant could have stopped himself from killing Victim, despite Defendant's schizophrenia diagnosis. In particular, the evidence of enjoyment that Defendant experienced by killing Victim points not to a lack of self-control due to insanity but to an affirmative indulgence in self-gratification. We therefore decline to upset the jury's finding of sanity.

### 3.　Deliberate intent for first-degree murder

**{43}**　Finally, Defendant challenges the sufficiency of the evidence that he deliberated and was therefore guilty of first-degree murder. *See* § 30-2-1(A)(1) (providing that first-

degree murder is a "willful, deliberate and premeditated killing"). In contrast, a second-degree murder is murder "committed without such deliberation and premeditation but with knowledge that the killer's acts create a strong probability of death or great bodily harm." *Garcia*, 1992-NMSC-048, ¶ 22. If the evidence indicates only "that the accused acted rashly or impulsively, rather than deliberately, and if the accused acted intentionally and without justification or provocation, then the facts would only support second-degree murder." *State v. Adonis*, 2008-NMSC-059, ¶ 16, 145 N.M. 102, 194 P.3d 717.

**{44}** To convict on first-degree murder, the jury had to find that Defendant acted with deliberate intent to take away Victim's life. Section 30-2-1(A)(1); UJI 14-201 NMRA. The distinction between a first- and second-degree murder conviction therefore rests on the definition of deliberate intent. *See Tafoya*, 2012-NMSC-030, ¶ 39. The jury was instructed as follows:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

UJI 14-201; *see also Tafoya*, 2012-NMSC-030, ¶ 39; *Adonis*, 2008-NMSC-059, ¶ 14.

**{45}** Defendant maintains that there is not sufficient evidence that he acted with the deliberate intent to take Victim's life. In short, Defendant argues that he lacked the capacity to form deliberate intent due to his mental illness, because he had consumed three beers, and because the act occurred within a short period of time.

**{46}** Defendant argues that schizophrenia limited his capacity to form the deliberate intent to kill required to sustain a first-degree murder conviction. While mental illness may be a factor considered in the question of deliberation for purposes of a first-degree murder conviction, the State correctly articulated that *Adonis* did not hold that individuals with mental illnesses are always too limited in mental capacity to form deliberate intent. *See Adonis*, 2008-NMSC-059, ¶¶ 18-25 (asserting that a defendant may not "rel[y] on a lack of mental capacity to form the intent required to commit" first-degree murder). Here, whether Defendant's schizophrenia diagnosis hindered his ability to form deliberate intent to kill Victim was a question properly decided by the fact-finder.

**{47}** Next, Defendant relies on *State v. Garcia*, 1992-NMSC-048, where the Court determined that there was no evidence to support deliberate intent for first-degree murder when the defendant had been drinking. In contrast to *Garcia*, where the defendant had consumed at least ten beers and three shots of whiskey, *id*. ¶ 9,

Defendant here only consumed three beers, and there was no evidence that he showed signs of intoxication. A reasonable jury could have thus found that Defendant's ability to form deliberate intent was not hindered by his alcohol consumption.

{48}    Last, Defendant argues that the time period in question was too brief to allow for the formation of deliberate intent. Defendant cites *Tafoya*, 2012-NMSC-030, ¶ 41, where this Court vacated a conviction for attempted first-degree murder and remanded for entry of judgment of attempted second-degree murder and where only "a second or two at most" passed between the shooting of the first and the second victim. *Id.* ¶ 52.

{49}    While *Tafoya* does not explicitly hold as Defendant argues that "a killing that occurred within a short time span is more likely to support a conviction for second-degree murder than deliberate intent [first-degree murder]," *Tafoya* does discuss the potentially complex temporal considerations posed by the deliberate intent standard. *Id.* ¶ 41. However, in *Tafoya*, this Court concluded, "The notion that careful reasoning can occur in a short period of time seems somewhat counterintuitive, and rash and impulsive killings are far more likely to be the product of an expedited decision-making process than are carefully contemplated killings." *Id.*

{50}    Despite the brevity of time that passed between when Defendant formed the intent to kill Victim, or when he "just . . . snapped," and when Defendant killed victim, we agree with the State that sufficient evidence of deliberation was presented. After Defendant developed the intent to kill, he then took conscious steps to walk through his house to retrieve a knife, address Victim in a theatrical manner saying that he had a "present" for her, and finally manipulate her neck before stabbing her. Further, the State points to Defendant's descriptions of mounting tension between himself and Victim throughout the week and a half before the killing as evidence of deliberation. Defendant nevertheless argues that the State's evidence may be indicative of the intentionality of the crime but not of careful deliberation.

{51}    With regard to the temporal distinction between deliberate intent of first-degree murder and the "rash impulse" killings categorized under second-degree murder, a short time period may not be dispositive where there is evidence that a defendant "weigh[ed] and consider[ed] the question of killing," UJI 14-201, despite how brief this consideration may have been. While this Court stated in *Tafoya* that "rash and impulsive killings" are often linked to a hasty period of consideration, the inverse reasoning does not consistently apply. Even a momentary decision can support a conviction for first-degree murder where there is evidence that a defendant engaged in "careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201.

{52}    While there may be a time period so short that it necessarily precludes a defendant's ability to form deliberate intent, the brevity of the time frame of a purported deliberation must be examined on a case-by-case basis. Here, we conclude that sufficient evidence demonstrated that Defendant recognized his desire to kill Victim, had an awareness of the consequences of the decision before him, and then proceeded to take multiple steps to implement this decision. Thus, based on our review of the

cumulative evidence and in deference to the jury's role as fact-finder, we hold that a reasonable jury could have found that Defendant possessed the requisite level of deliberate intent to be convicted of first-degree murder, and we affirm his conviction.

## III.   CONCLUSION

**{53}**   Based on the foregoing, we affirm Defendant's convictions.

**{54}   IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**