This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: April 8, 2024**

**No. S-1-SC-39509**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**ROBERT CHAVEZ,**

      Defendant-Appellant.

**CAPITAL APPEAL**
**Angie K. Schneider, District Judge**

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Jane A. Bernstein, Assistant Attorney General
Santa Fe, NM

for Appellee

### DECISION

**VARGAS, Justice.**

**{1}** Pursuant to Rule 12-102(A)(1) NMRA, Defendant Robert Chavez appeals his convictions for two counts of first-degree murder by deliberate killing contrary to NMSA 1978, Section 30-2-1(A)(1) (1994). Defendant seeks reversal of his convictions on the grounds that (1) there was insufficient evidence to convict Defendant of the murders based on uncorroborated accomplice testimony; (2) the district court erred when it admitted testimony of a police deputy recounting the contents of a witness's statement

under Rule 11-803(1) NMRA, the "present sense impression" exception to the rule against hearsay; and (3) the district court erred when it admitted segments of Defendant's recorded jail telephone calls.

**{2}** We affirm Defendant's first-degree murder convictions because the accomplice testimony was corroborated and there was sufficient evidence to convict Defendant and because the district court did not abuse its discretion in its evidentiary rulings. Because the issues in this case are sufficiently addressed by New Mexico precedent, we exercise our discretion to resolve this case by way of nonprecedential decision under Rule 12-405(B)(1) NMRA.

## I.    BACKGROUND

**{3}** In 2009, Maximiliano Griego (Victim Griego) and his girlfriend, Mary Hudson Gutierrez (Victim Gutierrez), were fatally shot in their Alamogordo home. Approximately ten years later, in 2019, Defendant was indicted for the murders after Defendant's nephew, Joey Chavez, came forward with information about the case. Joey agreed to testify truthfully in this case in exchange for a shorter sentence in a separate felony matter.

**{4}** At the time of the murders, Defendant lived in Arizona with Joey, then fifteen, and headed a drug-trafficking organization with his brother, Joe Chavez, who resided in Alamogordo. In 2009, Defendant rented a vehicle in Arizona and drove to Alamogordo with Joey and two associates. Joey testified that, once they arrived in Alamogordo, Defendant and his brother discussed their plan to kidnap and kill Victim Griego because he had been "making threats" and had fired shots at a family member's house. Defendant and his brother made a plan to ask one of their female customers to lure Victim Griego to her house. At Defendant's instruction, Joey and one of Defendant's associates bought long, thick, plastic zip ties to bind Victim Griego during the kidnapping.

**{5}** Later that day, Defendant's brother asked Melisa Eveleth—an Alamogordo woman who bought methamphetamine from Defendant and his brother at the time—to get in touch with Victim Griego because he wanted to talk to him about "steppin' on his toes" by selling meth to his customers. Melisa testified that at the direction of Defendant's brother, she contacted Victim Griego and asked him to bring $800 worth of meth to her house, without mentioning that Defendant or his brother were involved.

**{6}** Before Victim Griego arrived at Melisa's house, Defendant's brother, Defendant, and one of Defendant's associates arrived at Melisa's house. Joey testified that he waited in a vehicle outside of Melisa's house for about an hour before Defendant emerged from the house. Meanwhile, Defendant's brother and the associate stayed at Melisa's house, waiting for Victim Griego to arrive. Later, Victim Griego arrived and Melisa went with him to a back room in the house to smoke meth. Victim Griego had not seen the other men in the house yet because they were hiding in another room. As Victim Griego was about to start smoking, Melisa turned around and saw two men standing behind her with guns. Melisa heard the men say the names "Bob" (Defendant's

nickname) and "Mighty Mouse" (Defendant's associate's nickname) before she ducked and ran out of the house through the back door. Running away, Melisa heard screaming coming from the back room and saw silhouettes of fighting in the window of the room where she had left Victim Griego.

**{7}** Later that evening, Defendant's brother called Melisa, laughing, and said that he "had [Victim Griego]," and warned her that there may be some blood at her house even though they had "cleaned up." Defendant also called Defendant's brother to let him know that they (Defendant and the two associates) had kidnapped Victim Griego and asked Defendant's brother to let them into a family member's vacant house. When Defendant's brother and Joey arrived at the vacant house, Joey saw Defendant and the two associates pull a black t-shirt off Victim Griego's head. Joey observed that the zip ties he had bought earlier bound Victim Griego's hands and that he had "bruises on his face and a couple of scrapes on the top of his head." Joey saw one of the associates hit Victim Griego on the head with a wooden stick and he witnessed Defendant taunt Victim Griego, asking him with a smirk, whose town is this?

**{8}** While these events were underway, Victim Gutierrez texted Victim Griego asking him where he was because he had not responded to several earlier text messages. She also called and texted a friend to ask if he knew where Victim Griego was. Then, at Defendant's direction, Victim Griego called Victim Gutierrez and asked her to leave the back door of her house open because he was coming home. Joey testified that Defendant directed his brother and his two associates to take Victim Griego to Victim Gutierrez's house and to kill them both.

**{9}** Joey testified that Defendant's brother and the two associates drove Victim Griego to Victim Gutierrez's house while he stayed behind with Defendant. At Victim Gutierrez's house, Alexandra Estrada (Alex), Victim Gutierrez's fifteen-year-old daughter, was asleep. Alex woke up to the sound of two gunshots. She found both Victims Griego and Gutierrez lying unresponsive in her mother's bedroom. She ran out to the living room and saw two men in dark clothes get into the passenger side of a vehicle, with someone else in the driver's seat. Alex called 911 and then gave her statement to Deputy Luis Herrera after the police arrived on scene.

**{10}** When Defendant's brother and two associates returned to the house where Defendant and Joey were waiting, Victim Griego was not with them. They discussed what had happened at Victim Gutierrez's house. Joey heard one of Defendant's associates say that he had shot both Victims Griego and Gutierrez. Defendant, his two associates, and Joey traveled back to Arizona in the rental vehicle. The next day, Melisa returned to her house in Alamogordo, where she found blood splattered in the kitchen and the back bedroom where she had left Victim Griego the day before.

**{11}** The case went cold until Joey came forward in 2019. After a three-day trial in 2022, the jury convicted Defendant of two counts of first-degree murder and the district court sentenced him to two consecutive life sentences. Defendant appeals directly to this Court.

## II.      DISCUSSION

## A.      Sufficiency of the Evidence

### 1.      Standard of review

**{12}** Defendant argues that the State presented insufficient evidence to convict him of first-degree murder. Our standard of review for sufficiency of the evidence is highly deferential to the jury's verdict. *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057. "New Mexico appellate courts will not invade the jury's province as fact-finder by second-guess[ing] the jury's decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] its judgment for that of the jury." *Id.* ¶ 5 (alterations in original) (internal quotation marks and citation omitted). "When reviewing the sufficiency of the evidence, we ask whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Martinez*, 2021-NMSC-012, ¶ 36, 483 P.3d 590 (internal quotation marks and citation omitted). "In performing this review, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891 (internal quotation marks and citation omitted).

### 2.      Sufficient evidence supports Defendant's first-degree murder convictions

**{13}** Defendant argues that the State did not present sufficient evidence to convict him of the murders because only one witness, Joey, "could tie [Defendant] to the murders in this case." This, according to Defendant, is "troublesome" because Joey was an accomplice to the murders and testified against Defendant in exchange for a lighter sentence in a separate matter. Defendant also argues that Joey's testimony was uncorroborated and conflicted with the testimony of other witnesses. Specifically, only Joey testified that he heard Defendant instruct another man (one of Defendant's associates who did not testify at trial) to kill Victims Griego and Gutierrez. For these reasons, his testimony, Defendant contends, should be viewed with suspicion.

**{14}** Defendant's argument is unpersuasive for two reasons. First, an accomplice is competent to testify, and we do not reweigh the credibility of an accomplice's testimony on appeal. *See* Rule 11-601 NMRA ("Every person is competent to be a witness unless these rules provide otherwise."); *see also* UJI 14-5020 NMRA (noting that the jurors "alone are the judges of the credibility of the witnesses and the weight to be given to the testimony of each of them"); *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314 ("This court does not weigh the evidence and may not substitute its judgment for that of the fact finder."). In fact, this Court has held that even the uncorroborated testimony of an accomplice is sufficient to support a conviction. *See State v. Kidd*, 1929-NMSC-025, ¶ 3, 34 N.M. 84, 278 P. 214 ("The uncorroborated testimony of an accomplice is sufficient in law to support a verdict."); *State v. Gutierrez*, 1965-NMSC-143, ¶ 4, 75 N.M. 580, 408 P.2d 503 ("[T]he rule in this jurisdiction is that a defendant may be convicted on the uncorroborated testimony of an accomplice.").

**{15}** On its cross-examination of an accomplice, "[a] defendant can raise any ulterior motive he or she believes the witness may have, such as a motive to fabricate testimony, and challenge such testimony on cross-examination, as well as raise questions during closing argument." *State v. Sarracino*, 1998-NMSC-022, ¶ 12, 125 N.M. 511, 964 P.2d 72. During its direct examination of Joey, the State elicited testimony that he had pled guilty to two felonies in 2017 and that he made an agreement with the State to testify truthfully against Defendant in this case in exchange for a thirteen-year sentence in the 2017 case. Defense counsel then attempted to impeach Joey's credibility on cross-examination, challenging his memory of events. Defense counsel also challenged Joey's credibility in her closing argument. The jury was instructed to judge "the credibility of the witnesses and the weight to be given to the testimony of each of them," depending on the witness's truthfulness, memory, or bias. Thus, the jury was instructed to consider whether there were facts, including the agreement that Joey had with the State, that weighed against his credibility as a witness in this case. It was within the jury's province as fact-finder to make a decision concerning Joey's credibility and this Court will not second-guess that decision. *See Garcia*, 2011-NMSC-003, ¶ 5.

**{16}** Second, Defendant's contention that Joey's testimony was uncorroborated is incorrect. Other witness testimony and documentary evidence corroborated Joey's testimony. For example, the State presented a rental agreement and bank statement corroborating Joey's testimony that Defendant rented a vehicle and drove it from Phoenix to Alamogordo, and back to Phoenix, on the dates in question. Defendant's brother's girlfriend in 2009— Tracey Garrison—corroborated Joey's testimony about the long, thick zip ties that were used to bind Victim Griego's hands; Tracey testified that on the weekend in question, she saw large, thick zip ties in Defendant's brother's house, where Joey and Defendant had stayed that weekend. The medical investigator's testimony about lacerations and abrasions found on Victim Griego's head that resulted from blunt force trauma, not a gunshot wound, corroborated Joey's testimony that he had seen bruises and scrapes on Victim Griego's head and that he had seen Defendant's associate hit Victim Griego on the head with a wooden stick that night.

**{17}** Also, Victim Gutierrez's phone calls and text messages to her friend and to Victim Griego, asking him where he was on the evening of the murders, corroborated the timeline of Victim Griego's kidnapping that Joey provided. Melisa Eveleth corroborated Joey's testimony about Defendant's plan to use a woman to lure Victim Griego, testifying that Defendant's brother instructed her to ask Victim Griego over to her house under false pretenses. Both Joey and Melisa identified the same house— Melisa's house at the time—as the location where Victim Griego had been lured. All of these facts corroborate Joey's testimony about the circumstances surrounding the murder of Victim Griego and Victim Gutierrez.

**{18}** We agree with the State that any inconsistencies between Joey's testimony and other witnesses' testimony did not render Joey's testimony "inherently improbable," as Defendant contends. *See State v. Armijo*, 1931-NMSC-008, ¶ 34, 35 N.M. 533, 2 P.2d 1075 (holding that an appellate court may set aside a conviction supported by one witness's uncorroborated testimony that is inherently improbable). To the extent that

Joey's testimony conflicted with that of other witnesses, it was within the jury's province to evaluate any contradictions in the testimony and make its own determination about each witness's credibility. Also, to the extent that Defendant argues that some witness testimony—including testimony of Melisa Eveleth and Tracey Garrison—conflicted with Joey's simply because their testimony did not provide as much detail as Joey's, that argument is without merit. Their testimony was still corroborative of Joey's firsthand account of events. *See* 29A Am. Jur. 2d *Evidence* § 1363 (2023) ("Circumstantial nonaccomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense.").

**{19}** Because Joey's testimony was neither inherently improbable nor uncorroborated, we agree with the State that this is not the proper case to revisit our precedent that allows uncorroborated accomplice testimony to support a conviction, as Defendant requests. *See Kidd*, 1929-NMSC-025, ¶ 3; *Gutierrez*, 1965-NMSC-143, ¶ 4. The State presented sufficient evidence for any rational trier of fact to find Defendant guilty of first-degree murder beyond a reasonable doubt.

**B.     Evidentiary Issues**

**1.     Standard of review**

**{20}** "We review the district court's decision to admit or exclude evidence for an abuse of discretion." *State v. Guerra*, 2012-NMSC-014, ¶ 36, 278 P.3d 1031. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Smith*, 2016-NMSC-007, ¶ 27, 367 P.3d 420 (internal quotation marks and citation omitted). "A court abuses its discretion if it applies an incorrect standard, incorrect substantive law, or its discretionary decision is premised on a misapprehension of the law." *State v. Adams*, 2022-NMSC-008, ¶ 35, 503 P.3d 1130 (brackets, internal quotation marks, and citation omitted).

**2.     The district court did not abuse its discretion when it admitted Alex Estrada's statement to Deputy Herrera under Rule 11-803(1)**

**{21}** Defendant argues that Alex Estrada's statements to Deputy Herrera were improperly admitted under Rule 11-803(1). Rule 11-803(1), the "present sense impression" exception to the rule against hearsay, allows the admission of hearsay "describing or explaining an event or condition, made while or immediately after the declarant perceived it." "A present-sense impression is admissible because the substantial contemporaneity of the event and statement negate the likelihood of deliberate or conscious misrepresentation." *State v. Leyba*, 2012-NMSC-037, ¶ 17, 289 P.3d 1215 (brackets, internal quotation marks, and citation omitted).

**{22}** According to Defendant, the district court deprived him of his right to a fair trial when it admitted Deputy Herrera's testimony under Rule 11-803(1). Defendant argues that Alex's statement was unreliable and should not have been admitted as a present sense impression because too much time had lapsed between the shooting and Deputy Herrera's interview with Alex.

**{23}** We disagree. The district court did not abuse its discretion—much less did it deprive Defendant of his right to a fair trial, as Defendant argues—when it admitted Deputy Herrera's testimony about Alex's statement under Rule 11-803(1). After defense counsel objected to the State's attempt to introduce Alex's statement to Deputy Herrera on hearsay grounds, the district court called a side bar. The district court considered the arguments of both parties and listened to Deputy Herrera's proposed testimony outside of the jury's presence. In his statement to the district court, Deputy Herrera estimated that fifteen minutes had elapsed between the shooting and his interview with Alex. Only then did the district court rule that Alex's statement to Deputy Herrera regarding the events that evening was admissible under Rule 11-803(1).

**{24}** In its oral ruling, the district court cited *State v. Perry*, noting that, in that case, the court admitted a statement under Rule 11-803(1) that the declarant had made about five to ten minutes after the attack in question had occurred. *See State v. Perry*, 1980-NMCA-156, ¶ 7, 95 N.M. 179, 619 P.2d 855 ("The [district court] judge, pursuant to [Rule 11-803(1)], must decide whether the time element involving the perception affects the reliability of the evidence."). And, the district court noted, "the time issue is related to the trustworthiness of the statement." In this case, where the delay between the shooting and Alex's interview with Deputy Herrera was about fifteen minutes, the district court reasoned, "I believe that is not too far or too big of a separation from the events to [Alex] making those statements to make it unreliable. . . . And there is no reason for her to have fabricated" her statement. Deputy Herrera then testified in accordance with the district court's ruling—he testified that Alex told him she woke up that night with the sound of two gunshots; she saw Victims Griego and Gutierrez lying in her mother's bedroom; and she saw two Hispanic males getting into a four-door sedan.

**{25}** There is nothing in the record to indicate that the district court's ruling was clearly against the logic and effect of the facts and circumstances in this case or that it misapprehended the law. *See Adams*, 2022-NMSC-008, ¶ 35. The district court carefully evaluated the relevant law, the parties' arguments, and the proposed testimony before making its ruling. The district court's ruling properly applied Rule 11-803(1) and relevant case law interpreting the rule to reach its decision. Indeed, the district court's ruling was exemplary for appellate review purposes because it "place[d] on the record the circumstances and factors critical to the decision," relying "upon discretionary authority" to admit Deputy Herrera's testimony under Rule 11-803(1). *See State v. Trejo*, 1991-NMCA-143, ¶ 7, 113 N.M. 342, 825 P.2d 1252.

### 3. The district court did not abuse its discretion when it admitted Defendant's jail call

**{26}** Defendant next argues that the district court erred when it admitted phone calls Defendant made from jail, days before the commencement of trial. Over defense counsel's objections, the district court admitted portions of a jail call in which Defendant appeared to discuss his case and Joey Chavez's involvement in it. In reference to Joey, Defendant stated:

You're a rat, you're a rat, you know? . . . I don't make the rules, you know? If you wanna rat, that shit's gonna be on paper. When the paper goes around, snitches get stitches. [laughs] But you know . . . I mean, I, I don't have nothin' to do with it. His name's already out there that he's a snitch. I don't have nothin', that's outta my hands. What happens to him after that . . . he did that to himself. Nobody told him to fuckin' start tryin' to, if he'd kept his mouth shut we'd have all been ok.

Defendant argues that the call prejudiced him because it informed the jury that Defendant had been held in jail pending trial, making the jury more likely to think of him as a dangerous criminal, thereby undercutting his right to the presumption of innocence. Defendant contends that admission of the jail call was so prejudicial that it "was no different than if the court had allowed [Defendant] to appear in his jail uniform."

**{27}** Both parties cite to our decision in *State v. Rodriguez*, S-1-SC-36459, dec. ¶ 20 (N.M. Sept. 20, 2018) (nonprecedential) in their briefs. In *Rodriguez* this Court concluded that the district court did not abuse its discretion when it admitted recordings of Defendant's jail calls made while he was in pretrial custody for a first-degree murder charge. During the calls, the defendant in *Rodriguez* discussed the evidence the police had found and he indicated that he remembered "exactly what happened," even though the theory of his defense was that he had been too high to remember the murder. *Id.* ¶ 17. This Court reasoned that "[a]lerting the jury of [the d]efendant's incarceration was not, as [the d]efendant argues, the same as a defendant appearing before the jury in prison clothing or shackles" because the calls "were proffered as evidence of [the d]efendant's mental state," not to imply that "the defendant was guilty or a person of bad character." *Id.* ¶ 20. This Court concluded that the district court properly weighed the jail calls' prejudicial impact (alerting the jury that the defendant was in jail three days after the crime took place) with its probative value (evidence of the defendant's mental state at the time of the killing) pursuant to Rule 11-403 NMRA before admitting the recordings.

**{28}** In this case, like in *Rodriguez*, the district court weighed the probative value of the jail calls against their prejudicial effect before admitting them. Again, nothing in the record indicates that the district court's ruling was clearly against the logic and effect of the facts and circumstances in this case or that it misapprehended the law. After listening to the calls and counsels' full arguments on the record, the district court explicitly stated that it agreed with the State that "of course it is prejudicial, but the prejudicial impact does not substantially outweigh the probative value." *See State v. Maxwell*, 2016-NMCA-082, ¶ 24, 384 P.3d 116 ("The purpose of Rule 11-403 is not to guard against any prejudice whatsoever, but only against the danger of unfair prejudice. Evidence is not unfairly prejudicial simply because it inculpates the defendant. Rather, prejudice is considered unfair when it goes only to character or propensity." (emphasis, internal quotation marks, and citation omitted)). Thus, the district court properly exercised its discretion when it applied Rule 11-403 before admitting the jail calls.

**{29}** Defendant argues that *Rodriguez* is distinguishable from this case because Defendant's "pretrial detention occurred in the aftermath of the highly publicized 2016

constitutional amendment to limit the use of financial bonds. Thus, the jury likely knew that [Defendant's] detention was not because of poverty, but . . . because the court found him 'dangerous' or a flight risk." We agree with the State that there is nothing in the record to indicate that "the bail-reform issue swayed the jury." The prejudicial impact of alerting the jury that Defendant was in jail before trial was minimal, "as it is commonly understood that a person suspected of committing murder may be held in pre-trial custody." *Rodriguez*, S-1-SC-36459, dec. ¶ 20.

{30}     In sum, the district court did not abuse its discretion in making either of the evidentiary rulings challenged by Defendant.

## III.     CONCLUSION

{31}     For the foregoing reasons, we affirm Defendant's first-degree murder convictions.

{32}     **IT IS SO ORDERED.**

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

**C. SHANNON BACON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**DAVID K. THOMSON, Justice**

**BRIANA H. ZAMORA, Justice**