
# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**BRANDON MICHAEL ACOSTA,**
Defendant-Appellant.

Supreme Court Case No.: CRA20-010
Superior Court Case No.: CF0640-18

## OPINION

**Cite as: 2022 Guam 11**

Appeal from the Superior Court of Guam
Argued and submitted on August 26, 2021
Via Zoom video conference

Appearing for Defendant-Appellant:
F. Randall Cunliffe, *Esq.*
Cunliffe & Cook
A Professional Corporation
210 Archbishop Flores St., Ste. 200
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Jeremiah B. Luther, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913

**E-Received**
12/19/2022 10:46:22 AM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, J.:**

[1]     This appeal challenges the convictions of Defendant-Appellant Brandon Michael Acosta. Acosta argues that the trial court erred in finding that Guam's Criminal Sexual Conduct ("CSC") statutes apply to deceased victims. He next urges that the trial court was wrong to allow the jury to return verdicts on included charges. As a third allegation of error, he contends that the trial court should have suppressed any statements he made to the police because his will was overborne. Finally, he says that the trial court failed to make required statutory findings before sentencing him to pay a fine.

[2]     We concur with the trial court's analysis of Guam's CSC statutes and agree that Acosta's statements to police were not subject to suppression. We find, however, that the trial court should have conducted an included-offense analysis after the issue was raised by the parties rather than merging charges for sentencing. We also hold that the trial court erred in sentencing Acosta to pay a fine without following the procedure dictated by statute. We affirm in part, reverse in part, and remand for the trial court to conduct an included-offense analysis, a hearing on the fine, and for resentencing.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[3]     On the morning of June 16, 2018, Salomae N. ("Salomae") found her teenage granddaughter, T.N., lying in a strange position in the house where T.N. slept. Salomae saw that T.N.'s legs were off the bed, and when she pulled off the blanket covering T.N.'s head and back, she noticed some blood around T.N.'s hair and a cut on T.N.'s shoulder. Nauta called for her son, and eventually someone called 911. The Guam Fire Department ("GFD") arrived, as well as the

Guam Police Department ("GPD").  GPD first believed they were responding to a suicide, but upon entering the scene found evidence inconsistent with suicide.

[4]      Detective Eric Mondia testified that he was the third officer on scene after the patrol officers and arrived shortly before 9:00 a.m.  Upon entering the house, he observed "a lifeless female body kneeling on the ground with . . . the top part of her upper torso laying on the bed"; her head was tilted to the left.  Transcript ("Tr.") at 11, 16 (Jury Trial, Mar. 6, 2020).  He observed blood spatter and droplets on the wall against which the bed was pushed.  T.N. was partially naked, and her underwear looked "as if somebody . . . had kind of like pulled it up."  *Id.* at 16.  Both of her knees were on the ground with her feet stretched back as though kneeling.  T.N.'s right hand was extended above her head, with her left hand dangling on the bottom of the bed by her legs.  The bed was soaked with what appeared to be blood near where T.N.'s head rested.  Detective Mondia also noted a "grouping of blood saturation" six inches to the left of this area.  *Id.*  T.N. was wearing a brassiere, but the left strap had been cut, exposing her breast.  While describing an admitted crime scene photograph, Detective Mondia identified a blood smear on the wall which signified to him that at one point, T.N. had been up against the wall after she was injured.  Detective Mondia observed multiple wounds.  There was a "six- to eight-inch deep laceration in the back, right across the two shoulder blades . . . below the neckline and directly across the spine."  *Id.* at 17.  He observed a deep laceration to the left side of the neck with cartilage exposed.  T.N.'s ear had been sliced in half, and more superficial wounds were present on the left side of her face.  On T.N.'s left hand, Detective Mondia observed what appeared to him to be a defensive wound.  In his experience, defensive wounds are found on victims trying to defend themselves by putting their hands up or turning away.  Detective Angel Santos also testified that he observed a "laceration to her left index finger" with "a whole piece missing . . . attached by a shred of skin."  Tr. at 8, 16,

17 (Jury Trial, Mar. 5, 2020). He also believed it was a defensive wound, as if T.N. had "observed the strike coming and picked up her hand to block it." *Id.* at 17. Detective Santos also noticed a pair of bloody shorts.

[5]      Dr. Martin Ishikawa, a part-time forensic pathologist for the Guam Chief Medical Examiner's Office, testified at trial as a certified expert in anatomic and forensic pathology. Dr. Ishikawa did not perform T.N.'s autopsy but testified at trial based on an autopsy report by Dr. Aurelio Espinola and Dr. Ishikawa's own review of the autopsy photographs, scene photographs, and a supplemental police record. Dr. Ishikawa agreed with the assessment in Dr. Espinola's report that there were eight "sharp force injuries" on T.N.'s body: five "clustered in the left side of the face, left side of the neck," one on the "lower left neck," one on the "left index finger," and one on the "upper mid back." Tr. at 158-59 (Jury Trial, Mar. 6, 2020).

[6]      Dr. Ishikawa observed one "deeper injury" to the left side of T.N.'s face that went into "deeper soft tissues" and damaged a portion of the skull known as the mastoid process. *Id.* at 159. He observed another deep injury on the left side of T.N.'s neck that went into the "deep soft tissues" and "transected the cervical spine" at the C-6 vertebrae; he believed such an injury would have rendered T.N. "functionally paraplegic, but still . . . able to breathe" or "quadriplegic." *Id.* at 159, 162-63. Dr. Ishikawa noted that an injury of this nature "inevitably" would have cut through large blood vessels of the neck, including the carotid artery and the jugular vein, resulting in bleeding. *Id.* at 163.

[7]      Dr. Ishikawa opined that the sharp force injury to the left index finger fit the typical pattern of a defensive type wound. He also testified that the injury to the "mid upper back" differed from the others found on the body because it lacked a "vital reaction, meaning that the injury happened either at or . . . directly after death, meaning that there is basically no blood flow in the tissue by

the time that injury happens to the body." *Id.* at 166. Dr. Ishikawa concluded that the cause of death was "multiple sharp force injuries," the mechanism of death was "hemorrhage or bleeding out," and the manner of death was homicide. *Id.* at 169.

[8]     During the autopsy, buccal, vaginal, and anal swabs were taken to test for DNA samples. Brandon McCollum, a Forensic DNA Examiner for the FBI's DNA Casework Unit, compared the samples from T.N.'s body to those taken from various persons of interest and concluded that the DNA found in the anal and vaginal swabs from the body was consistent to a high degree of certainty with origination from two people: T.N. and Brandon Acosta. McCollum also testified that the vaginal and anal swabs of T.N. contained semen. No injuries were found to the genitalia or anus, but Dr. Ishikawa testified that in his experience, such a lack of injuries does not rule out penetration or sexual related trauma. Dr. Ishikawa also testified that the presence of semen in the vaginal tract was consistent with sexual intercourse.

[9]     Around the same time that T.N. was killed, a burglary occurred at the Quan residence across the street from the house where T.N. was found. Acosta, who lived nearby, was identified as a suspect in the burglary and was eventually taken in for questioning with Detective C.J. Lizama in June 2018. Acosta became a person of interest in T.N.'s case, and he was taken in for additional questioning on October 19, 2018, with Detectives Mondia and Santos.

[10]     Detective Santos writes a daily Bible verse on a white board in the office he shares with Detective Mondia. Detective Santos testified that on October 19, 2018, the daily verse was "First Psalm 1:9" and that it said, "To be free to confess our sins, he is faithful and just to forgive us. He will cleanse us of all unrighteousness." Tr. at 72-73 (Jury Trial, Mar. 5, 2020).

[11]     Acosta was read his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), appeared to understand them, and signed a waiver. The interview began around 3:20 p.m. and took place in

the detectives' office rather than an interview room. Detective Santos testified that during the interview, they "discussed matters of [their] faith [and the] passing of [Acosta's] son." *Id.* at 72. Detective Santos had previously discussed faith and the death of Acosta's son with Acosta while transporting him after his initial interview in June with Detective C.J. Lizama about the burglary.

[12] When the interview had essentially concluded several hours later, Detective Mondia placed Acosta under arrest and left the room to speak with his supervisor; Detective Santos remained in the room. Detective Santos testified that Acosta then appeared "distant" and "requested to pray," at which point Detective Santos prayed with him and "reminded [Acosta] . . . of the verse on the board." *Id.* at 74. According to Detective Santos, the conversation continued:

> Q    And then what happened?
>
> A    And we accepted Jesus Christ as lord and savior, and then he -- at one point, he began -- I was telling him that his story matters.
>
> Q    You told him that?
>
> A    Yes, sir. That we're not just bags of bones, you know, we're human beings, we're people.
>
> Q    Okay. What was his -- did he have a reaction there?
>
> A    Yes, sir, he was crying.
>
> Q    And what happened next?
>
> A    Then he started to tell me about his story, and I know that I -- um -- I apprised him that he was -- you know, he -- apprised him as to his rights, and he said -- or reminded him about his rights, and he acknowledged it.
>
> He continued to talk, and just telling me about, you know, the struggle he had gone through as a child.
>
> Q    Okay.
>
> A    . . . . His son's passing. His regrets. Then him having to turn to drugs so as to cope with the pain.

. . . .

And that after -- you know, after we talked about that, you know, he just said he just started to go downhill.

Q       He started to what?

A       He started to go downhill after turning to drugs.

Q       Okay.

A       . . . . I told him, you know, it's not about -- the mistake doesn't define us.  What we do to fix it is what makes us.

*Id.* at 74-76.

[13]     Acosta then admitted to the burglary at the Quan residence and mentioned that he "went next door."  *Id.* at 76.  Acosta told Detective Santos he was under the influence of methamphetamines that night.  The detective followed up on Acosta's reference to "next door" to ask if he meant he went to "[T.N.]'s house," and Acosta nodded in the affirmative. *Id.*  Detective Santos testified that Acosta said he went into T.N.'s room to take belongings and was "startled by an unknown individual that he couldn't see."  *Id.* at 77.  Detective Santos said that Acosta told him while crying that "what happened inside [T.N.'s room], he didn't want -- that wasn't his intent, and that it was a mistake."  *Id.* at 78-79.  The conversation then turned back to faith, and Acosta said he believed his spirit was set free. *Id.* at 79; *see also* Tr. at 89 (Jury Trial, Mar. 6, 2020) (testimony of Detective Mondia that Acosta told Detective Santos, "I don't believe I should be charged with aggravated murder, because what happened in there was a mistake.  It wasn't my intention.").

[14]     Detective Santos testified that during the questioning, Acosta was given opportunities for bathroom breaks, offered food, and allowed to smoke and dip, and that

afterwards he offered to pray with Acosta anytime he needed. The interview was not recorded.

[15]    The final Amended Indictment included four charges for Aggravated Murder (As a First Degree Felony), two charges for Murder (As a First Degree Felony), two counts of First Degree Criminal Sexual Conduct ("CSC") (As a First Degree Felony), two counts of Second Degree CSC (As a Second Degree Felony), one charge for Home Invasion (As a First Degree Felony), one charge for Burglary (As a Second Degree Felony), one charge for Aggravated Assault (As a Second Degree Felony), and two counts of Third Degree CSC (As a Second Degree Felony); each had an accompanying Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony and a Notice of Commission of a Felony While on Felony Release.

[16]    Acosta moved to suppress his statements made to police but was denied. In what he styled as motions *in limine*, he also sought to dismiss all charges relating to criminal sexual conduct because the People could not prove that T.N. was alive at the time of the alleged acts. The trial court declined to adopt Acosta's interpretation of Guam's CSC statutes that the victim must be alive at the time of the alleged acts and denied his motions.

[17]    A jury returned guilty verdicts and the trial court entered "a JUDGMENT OF GUILTY" for:

- Charge One: Aggravated Murder (with underlying felony of Burglary)
- Charge Two: Aggravated Murder (with underlying felony of First Degree CSC)
- Charge Three: Aggravated Murder (with underlying felony of Second Degree CSC)
- Charge Four: Aggravated Murder (with underlying felony of Third Degree CSC)
- Charge Five: Manslaughter (as a lesser included offense of the Intentional or Knowing Murder with which he was charged)
- Charge Six: Murder (Recklessly, under circumstances manifesting extreme indifference to the value of human life)
- Charge Seven: First Degree CSC

- o Count One: sexual intercourse under circumstances involving Aggravated Assault
- o Count Two: anal intercourse under circumstances involving Aggravated Assault
- Charge Eight: Second Degree CSC
  - o Count One: causing the penis to touch the primary genital area under circumstances involving Aggravated Assault
  - o Count Two: causing the penis to touch the buttock under circumstances involving Aggravated Assault
- Charge Nine: Home Invasion
- Charge Ten: Burglary
- Charge Eleven: Aggravated Assault
- Charge Twelve: Third Degree CSC
  - o Count One: sexual penetration with a minor between 14 and 16 years of age
  - o Count Two: anal intercourse with a minor between 14 and 16 years of age

Record on Appeal ("RA"), tab 270 at 3-4 (Judgment, Jan. 12, 2021). Each included a Special Allegation for Possession or Use of a Deadly Weapon in the Commission of a Felony.[1] The People moved to dismiss the bifurcated portion of trial relating to the Notice of Commission of a Felony While on Felony Release; this was granted.

[18] The trial court sentenced Acosta to life in prison without the possibility of parole for Charge One (Aggravated Murder); twenty-five years of imprisonment for the Special Allegation attached to Charge One, to run consecutively to the above sentence; and twenty years of imprisonment for Charge Nine (Home Invasion), to run consecutively to the above sentence.

[19] The court then stated: "As to the remaining charges and attached special allegations, any sentence would merge with Charge One – AGGRAVATED MURDER (As a First Degree Felony) and its attached Special Allegation: Possession or Use of a Deadly Weapon in the Commission of a Felony." *Id.* at 5. Acosta was also ordered to pay a fine of $10,000.00.

[20] The trial court entered judgment, and this appeal followed.

---

[1] The Judgment does not mention the special allegation regarding Charge Twelve, Count Two. *See* Record on Appeal ("RA"), tab 270 at 4 (Judgment, Jan. 12, 2021). But the jury verdict form confirms that the jury found Acosta guilty of the special allegation on this count as well. RA, tab 232 (Verdict Form 15a, July 23, 2020).

## II. JURISDICTION

**[21]**     This court has jurisdiction to hear appeals from a final judgment of conviction of the Superior Court. 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-227 (2022)); 7 GCA §§ 3107, 3108(a) (2005); 8 GCA § 130.15(a) (2005).

## III. STANDARD OF REVIEW

**[22]**     Questions of law and statutory interpretation are reviewed *de novo*. *Camacho v. Shimizu*, 2021 Guam 22 ¶ 10 (per curiam); *People v. Quintanilla*, 2020 Guam 8 ¶ 22.

**[23]**     "Where a defendant raised the issue of sufficiency of the evidence by a motion for judgment of acquittal, we review the trial court's denial of the motion *de novo*." *People v. Song*, 2012 Guam 21 ¶ 26 (citing *People v. Anastacio*, 2010 Guam 18 ¶ 10).

**[24]**     "We review *de novo* the question of whether one offense is an included offense of another." *People v. Ramey*, 2019 Guam 11 ¶ 10; *see also People v. Nathan*, 2018 Guam 13 ¶ 10.

**[25]**     "In reviewing a trial court's denial of a motion to suppress, we review the court's findings of fact for clear error and its conclusions of law *de novo*." *People v. Santos*, 2020 Guam 5 ¶ 9; *Quintanilla*, 2020 Guam 8 ¶ 9.

**[26]**     We review for abuse of discretion the trial court's failure to make findings before imposing a fine. *See People v. Quinata*, 2010 Guam 17 ¶ 29 (citing *People v. Mallo*, 2008 Guam 23 ¶ 12).

## IV. ANALYSIS

**[27]**     We concur with the trial court that Guam's CSC statutes do not require a live victim and agree that Acosta's motion to suppress was properly denied. We find, however, that the trial court should have conducted an included-offense analysis rather than merging charges for sentencing and that it should have conducted the inquiries mandated by statute before imposing a fine.

**A. Guam's CSC Statutes Do Not Preclude Application to Deceased Victims**

[28]     Acosta's first allegation of error is that the trial court was incorrect in its determination that under Guam law, a CSC victim need not be alive at the moment of penetration provided the sexual assault is part of a continuous transaction or a series of closely related acts that includes the death of the victim. Appellant's Br. at 9-13 (Apr. 19, 2021). And because there was no evidence that the victim was alive when any touching or penetration occurred, he says, he is entitled to a new trial. *Id.* at 13. Acosta urges that "[f]ailure to allow a defendant to argue his theory of the case via an evidentiary ruling can violate his Fifth and Sixth Amendment rights." *Id.* at 11 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)).

[29]     Acosta's framing of the issue is problematic. *Holmes v. South Carolina*, 547 U.S. 319 (2006), addressed exclusion of third-party-guilt evidence and is thus inapplicable here. *See id.* at 321. Acosta's motions *in limine* were not evidentiary motions but asked the court to dismiss all charges relating to CSC based on his interpretation of the statutes. More broadly, statutory interpretation is a question of law for the court to decide, not a theory of defense to be submitted to the jury. *See* 8 GCA § 90.31 (2005) ("The court shall decide all questions of law which arise in the course of trial.").

[30]     Acosta is also incorrect on the merits of the argument: Guam's CSC statutes do not preclude application to deceased victims.

> **1. Although Michigan caselaw is generally persuasive in interpreting Guam's CSC statutes, the key Michigan case relied on by Acosta is internally inconsistent and has been undermined by later cases; we decline to follow it.**

[31]     Guam's CSC statutes were patterned after Michigan's, so cases interpreting Michigan CSC law are persuasive. *People v. Ehlert*, 2019 Guam 3 ¶ 20. Acosta relies on the holding in *People*

*v. Hutner*, 530 N.W.2d 174 (Mich. Ct. App. 1995) (per curiam), in which the Michigan Court of

Appeals stated:

> We conclude that the crime of criminal sexual conduct requires a live victim
> at the time of penetration.  Our statute . . . defines third-degree criminal sexual
> conduct as engaging in nonconsensual sexual penetration with another "person."
> Furthermore, a "victim" is a "person alleging to have been subjected to criminal
> sexual conduct."  A dead body is not a person.  It cannot allege anything.  A dead
> body has no will to overcome.  It does not have the same potential to suffer
> physically or mentally as a live or even an unconscious or dying victim.

*Id.* at 176.

[32]     But as the trial court recognized, the *Hutner* decision itself is internally inconsistent:

> However, the Michigan Court also noted in the context of a felony murder charge
> that a felony murder conviction may be sustained "where the victim dies during the
> attempt to perpetrate the underlying crime."  The Court finds that this holding is
> inconsistent with the Michigan Court's earlier rationale for its holding that criminal
> sexual conduct requires a live victim at the time of penetration.  Neither a criminal
> sexual conduct victim killed before penetration nor a felony murder victim killed
> during a criminal sexual conduct attempt is capable of alleging anything, yet in the
> latter instance a felony murder conviction will stand, while in the earlier instance a
> criminal sexual conduct conviction will not under the Michigan Court's reasoning.

RA, tab 162 at 4-5 (Dec. & Order, Apr. 24, 2020) (quoting *Hutner*, 530 N.W.2d at 176).

[33]     Furthermore, later panels of the Michigan Court of Appeals have declined to follow *Hutner*

based on the circumstances in the cases before them and have called *Hutner*'s reasoning into

question.  In an unpublished opinion a year after *Hutner* was decided, a different panel of the

Michigan Court of Appeals specifically stated their disagreement with the *Hutner* holding.  In

*People v. Diefenbach*, No. 176489, 1996 WL 33360429, at *2 n.1 (Mich. Ct. App. Aug. 20, 1996),

the court first distinguished the facts in *Hutner* from those in *Diefenbach*, noting that whereas "[i]n

*Hutner*, it was undisputed that the victim was dead before the penetration,"[2] the circumstantial

---

[2] In *Hutner*, the defendant confessed to the police, describing the incident as follows:

Defendant . . . grabbed the victim and choked her.  She fell to the ground, whereupon he hit her in
the head several times with a large lump of concrete.  Defendant felt for a pulse, and finding none,

evidence in *Diefenbach*—particularly the victim's injuries showing that force was used—was sufficient for a reasonable factfinder to find beyond a reasonable doubt that the victim was alive at the time of penetration. *Id.* at *2 & n.1, *3 ("If the woman was already dead, it would have been unnecessary for defendant to use much force to commit the sexual offense.").

[34]     Although the *Diefenbach* court could have ended its inquiry there and not followed *Hutner* because of distinguishable facts, the court was concerned about *Hutner*'s application in closer cases and went to some length to express its disagreement with the *Hutner* decision. The court noted its "concern[] that closer cases will require inappropriately fine—and irrelevant— distinctions to be drawn regarding precisely when a victim has died and when penetration has occurred." *Id.* at *2 n.1. After identifying the same inconsistency noted above by the trial court in Acosta's case, the *Diefenbach* court further suggested that their statute's "use of the word 'alleging' [in its definition of a CSC 'victim'] is grammatically awkward and that, in all likelihood, it was the intention of the Legislature to use the word 'alleged' instead. A person can be 'alleged' to have been subjected to rape regardless of whether they are dead or alive at the time." *Id.* Finally, the court noted that several other jurisdictions had reached results contrary to the *Hutner* decision. *Id.* (citing cases). The court concluded:

> We would find that the requirements of first-degree or third-degree criminal sexual conduct are satisfied when a person who is alive at the outset of a criminal assault is subjected to criminal penetration in the course of that assault; whether the victim died at the instant prior to the penetration or immediately after it commenced is irrelevant in terms of criminal culpability as well as in terms of the statute.

*Id.*

---

realized that the victim was dead. He dragged her body to a more secluded area and had sexual intercourse with the corpse.

530 N.W.2d 174, 175 (Mich. Ct. App. 1995). Based on this evidence, the court determined it was "undisputed that the victim died before penetration, and that defendant knew she was dead." *Id.* at 177.

**[35]**    More recently, in *Gilkey v. Burton*, No. 2:17-CV-13270, 2018 WL 2463114 (E.D. Mich. June 1, 2018), the United States District Court for the Eastern District of Michigan denied habeas relief to a petitioner who claimed insufficient evidence the victim was still alive at the time of sexual penetration.  Relying on *Diefenbach*, the District Court affirmed the Michigan Court of Appeals' finding of sufficient evidence.  *Id.* at *3-5.  While no direct evidence showed the penetration occurred before the victim died, the court determined the circumstantial evidence was sufficient for a rational trier of fact to conclude the victim was still alive at the time of the sexual assault.  *See id.* at *4-5.  Specifically, the court pointed to the evidence that the victim "was forced into a concealed area, where sexual penetration took place," "stabbed in the neck and left to die," was discovered with her dress "pulled up above her waist and her panties . . . pulled up over to the side," and that the "Petitioner's DNA matched the semen that was recovered from the victim's vagina and panties." *Id.* at *5.  Quoting *Diefenbach*, the court stated, "If the woman was already dead, it would have been unnecessary for defendant to use much force to commit the sexual offense." *Id.* (quoting *Diefenbach*, 1996 WL 33360429, at *2).  The Sixth Circuit affirmed, holding that the Michigan Court of Appeals' determination of sufficient evidence was not unreasonable given the circumstantial evidence of the defendant's guilt.  *See Gilkey v. Burton*, No. 18-1760, 2019 WL 2970841, at *2-3 (6th Cir. Mar. 22, 2019).

**[36]**    While we could simply find *Hutner* distinguishable from this case given the sufficient circumstantial evidence that T.N. was alive at the time of the sexual penetration, *see infra* Part IV(A)(5)—evidence which is similar in many respects to that in *Gilkey*—we go further and expressly reject the holding in *Hutner*.  The decision is internally inconsistent, and later Michigan courts have declined to follow it or outright rejected it.  We are unpersuaded by its reasoning and

instead, as discussed below, adopt the ongoing criminal assault rule followed by a majority of jurisdictions. *See infra* Part IV(A)(4).

[37]     We turn to Acosta's remaining arguments concerning whether a live victim is required to convict under Guam's CSC statutes.

### 2. Use of the phrase "human being" in some relevant definitions does not clarify that Guam's CSC statutes require live victims

[38]     Acosta also argues that CSC requires a living victim because definitional sections of the criminal code which are relevant to CSC offenses refer to the phrase "human being," which, elsewhere in the criminal code, is defined as someone who is "alive." Appellant's Br. at 10.

[39]     Some of Guam's CSC statutes refer to "sexual contact." *See, e.g.*, 9 GCA §§ 25.15(c), 25.20(a) (as amended by Guam Pub. L. 32-012 (Apr. 11, 2013)); *id.* §§ 25.25(c), 25.30(a) (2005). "Sexual contact" is defined within the chapter on sexual offenses to include "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification." 9 GCA § 25.10(a)(9) (2005). The term "intimate parts" is defined within the same chapter to "include[] the primary genital area, groin, inner thigh, buttock, or breast of a human being." *Id.* § 25.10(a)(4). Within Title 9 on Crimes & Corrections, but in Chapter 16 on Criminal Homicide, section 16.10 notes that "[a]s used in this Chapter: (a) *Human Being* means a person who has been born and is alive." 9 GCA § 16.10(a) (2005). Noting also that "[s]exual penetration is defined to occur to a person," Acosta reasons that the victim of criminal sexual conduct must be alive. Appellant's Br. at 10.

[40]     This argument fails for many reasons. First, the definition of "human being" that Acosta relies on is found within the *homicide* chapter, not the *sexual offense* chapter. The homicide section

begins by limiting the definitions to only "[a]s used in this Chapter." 9 GCA § 16.10(a). Facially, the definition is inapplicable. The definition section in the relevant sexual conduct chapter neither defines "human being" nor refers to section 16.10 as a source for its definition.[3] *See* 9 GCA § 25.10.

[41]     Second, it is not the case that in Guam's statutes a "human being" is necessarily alive. Guam's laws, like those of multiple states, mention "dead human being[s]." 10 GCA § 4A102(b) (2011) ("The next-of-kin . . . of the deceased shall be entitled to control the final disposition of the remains of any *dead human being* consistent with all applicable laws, including all applicable health codes." (emphasis added)). An individual does not cease to be a "human being" after death.

[42]     In 2021, the Supreme Court of New Mexico addressed a similar issue and disagreed with the defendant's argument that the word "person" refers only to a live human being. *State v. Martinez*, 2021-NMSC-012, ¶¶ 13, 23, 483 P.3d 590. Noting that "person" was defined by reference to "human being," the court held that a "human being" was not necessarily alive. *Id.* ¶ 17.

> The term *human being* is not used in the CSP statute, but it appears that the Legislature has used the term to describe both a living *and* a deceased person. *Compare* NMSA 1978, § 30-12-13 (1989) (prohibiting defacing of the "place of burial of any human being", *with* NMSA 1978, § 30-2-3 (1994) ("Manslaughter is the unlawful killing of a human being without malice.").

*Id.*

---

[3] By contrast, other statutes outside of Chapter 16 explicitly refer to section 16.10 as providing a definition for a term found in those other statutes. *See, e.g.*, 9 GCA § 37.10(c) (as amended by Guam Pub. L. 32:162:3 (May 23, 2014)) (for purposes of Chapter 37, relating to burglary and home invasion, "Deadly Weapon has the meaning provided by [9 GCA] § 16.10"); 9 GCA § 22.10 (2005) ("As used in this chapter [relating to kidnapping and related offenses], the terms bodily injury and serious bodily injury have the meanings provided by § 16.10."); 9 GCA § 92101(b), (p) (for offenses involving alcohol and controlled substances, "bodily injury" and "serious bodily injury" have same meaning as those terms are defined in 9 GCA § 16.10(b) and (c)); 9 GCA § 40.20 (2005) (for purposes of second degree robbery, "'Deadly Weapon' has the meaning provided by § 16.10").

**[43]** Other states, too, have statutes that refer to a "human being" in contexts in which the relevant individual is deceased. *See, e.g.*, N.Y. Pub. Health Law § 4217 (McKinney 2010) (on receipt of "the dead body of a human being"); N.D. Cent. Code § 43-17-40 (2021) (on liability for blood transmission from "one or more human beings, living or dead, to another human being"). Thus, the phrase "human being" does not necessarily refer to a live person for purposes of the CSC statutes.

### 3. Nor do other circumstances described in the text of CSC statutes require that all victims be alive

**[44]** Acosta next argues that "review of the various circumstances throughout the Criminal Sexual Conduct Chapter clearly indicate a living being." Appellant's Br. at 10. He points generally to the victim's age; that the actor knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; that force or coercion is used; and that the actor is armed with a weapon or an article used in a manner to lead the victim to believe it to be a weapon. *Id.*

**[45]** Because Acosta provides no citation to specific provisions, we cannot properly evaluate these arguments. We note in passing, however, that facially many circumstances he described may reasonably apply to deceased victims. For instance: it is common to discuss an individual's age at death. And our CSC statutes are written disjunctively to prohibit "any of the following circumstances." *E.g.*, 9 GCA § 25.15(a). Thus, even if one of the prohibited activities required a live victim, that would not implicate *all* prohibited activities. *See generally People v. Barcinas*, 2016 Guam 38 (reiterating that CSC statutes are to be read disjunctively).[4]

---

[4] Acosta's final sentence on this page of the opening brief suggests that "[t]here is a term for having sex with a corpse, necrophilia." Appellant's Br. at 10. In his reply brief, he expands on that statement only to argue that if the victim of CSC is not alive, "then Guam's desecration of the corpse statute, applies." Appellant's Reply Br. at 1-2 (June 18, 2021). Absent citation to the statutory provision and a more robust legal argument, we will not go searching for the Appellant's theory on this issue on appeal.

### 4.  We join the majority of jurisdictions rejecting a bright-line rule

[46]    Acosta cites one other case to support his argument that there should be a bright-line rule that Guam's CSC statutes apply only to live victims.  Appellant's Br. at 11 (quoting *State v. Perkins*, 811 P.2d 1142, 1150-51 (Kan. 1991)).  Instead, we join the "majority of jurisdictions" that have adopted some form of the "ongoing criminal assault" rule that it is CSC when a defendant both kills and sexually assaults a victim in a single, continuous act, or in a series of closely related acts, even if portions of the CSC, including penetration or sexual contact, occur once the victim has already been killed.  *See State v. McLaughlin*, 265 S.W.3d 257, 268 (Mo. 2008) (en banc); *see also Lipham v. State*, 364 S.E.2d 840, 842 (Ga. 1988); *State v. Brobeck*, 751 S.W.2d 828, 830-32 (Tenn. 1988); *Commonwealth v. Waters*, 649 N.E.2d 724, 726 (Mass. 1995); *State v. Whitsell*, 591 N.E.2d 265, 278 (Ohio Ct. App. 1990), *abrogated on other grounds by City of Dayton v. Erickson*, 665 N.E.2d 1091, 1097-98 (Ohio 1996); *People v. Gutierrez*, 932 N.E.2d 139, 155-59 (Ill. App. Ct. 2010); *State v. Usry*, 533 A.2d 212, 221-22 (Conn. 1987); *State v. Wilkinson*, 474 S.E.2d 375, 384-85 (N.C. 1996); *State v. Jones*, 705 A.2d 805, 813 (N.J. Super. Ct. App. Div. 1998); *Martinez*, 2021-NMSC-012, ¶¶ 22-23, 483 P.3d 590.

[47]    As the trial court stated below:

> This Court declines to adopt a bright-line rule that a [victim of criminal sexual conduct] must be alive at the moment of penetration.  The Court finds that Guam's criminal sexual conduct statutes do not preclude application to dead victims. . . .  The fact that death may have preceded the sexual act by an instant should not negate commission of the crime of criminal sexual conduct and reduce it to a relatively minor offense.  The *entirety* of a defendant's conduct from the beginning of the criminal assault through completion of the sexual act is to be considered.  It is [criminal sexual conduct] where a defendant both kills and sexually assaults a victim in a single, continuous act, or in a series of closely related acts, even if portions of the [assault], including penetration, occur once the victim already has been killed.  Accordingly, the Court holds that a [victim of criminal sexual conduct] need not be alive at the time of penetration provided the sexual assault is part of a continuous transaction."

RA, tab 162 at 5 (Dec. & Order).[5]

### 5. The evidence was sufficient for the relevant counts to be submitted to the jury

[48]     Below, Acosta titled his submissions Motions *in Limine*.  The Government urged that they should instead be "construed as motions for judgment of acquittal on factual grounds" because Acosta essentially argued "that at the time that sexual assault occurred, there is no evidence that the victim was alive."  RA, tab 158 at 2 (People's Resp. Mots. *In Limine*, Mar. 12, 2020).  Acosta "concede[d] that when looking at the evidence as it relates to the law, that it should be looked at in light most favorable to the Government, but that the evidence [is] insufficient to overcome the law."  RA, tab 159 at 2 (Reply People's Resp. Mots. *In Limine*, Mar. 13, 2020).  Noting this, the trial court's Decision first rejected the bright-line rule as a matter of law and then found "that sufficient evidence exists where a rational trier of fact could find the essential elements of each charge of criminal sexual conduct beyond a reasonable doubt."  RA, tab 162 at 3-6 (Dec. & Order) (footnote omitted).

[49]     Having agreed with the trial court on the legal question, we also agree that sufficient evidence was presented to sustain the convictions.  As the trial court appears to have treated the motions *in limine* at least partially as motions for judgment of acquittal, "we review the evidence presented at trial in the light most favorable to the People and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This is a 'highly deferential standard of review.'"  *Song*, 2012 Guam 21 ¶ 26 (internal citations omitted).  "In conducting this analysis, the People 'must be afforded the strongest legitimate view of the

---

[5] Acosta argues that adopting the ongoing criminal assault rule in Guam would be meaningless because under Guam's included-offense statute, a defendant could not be convicted of both homicide during the commission of CSC and the underlying included offense of CSC.  Appellant's Br. at 12.  But if a defendant is convicted of what is colloquially called felony murder, and the underlying felony is unrelated to CSC, a separate conviction for CSC would not necessarily be dismissed as an included offense.  *See* 9 GCA § 1.22 (2005); 8 GCA § 105.58 (2005).

evidence and all reasonable inferences that may be drawn therefrom.'" *Id.* ¶ 28 (quoting *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). "It is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *Id.* ¶ 29 (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)).

[50] Here, there is enough for the jury to have concluded that Acosta sexually assaulted T.N. before killing her or that he both killed and sexually assaulted T.N. in a single, continuous act or in a series of closely related acts, even if portions of the sexual assault occurred only after T.N. was killed.

[51] T.N. was found partially naked, with her panties positioned on the side "as if somebody . . . had kind of like pulled it up." Tr. at 16 (Jury Trial, Mar. 6, 2020). The left strap of T.N.'s bra had been cut and exposed her breast. A blood smear was identified on the wall, which suggested that at one point, T.N. had been up against the wall after she was injured. A pair of bloody shorts was found near the bed. Vaginal and anal swabs from T.N. were found to contain the DNA of Acosta and T.N.; they both contained semen. No DNA from any individual other than T.N. or Acosta was found on T.N.'s body. Although no injuries were found to the genitalia or anus of T.N., Dr. Ishikawa testified that in his experience, a lack of injuries does not rule out penetration or other sexual trauma. Dr. Ishikawa also testified that the presence of semen in the vaginal tract was consistent sexual intercourse.

[52] Multiple witnesses testified that the injury to T.N.'s left index finger suggested a defensive wound, as if she saw the blow coming and had raised her hand to block it. The jury could have reasonably attributed the lack of more defensive wounds to the condition of paraplegia likely caused by the blow to T.N.'s cervical spine. No evidence suggests that Acosta left the scene and

returned later to commit the sexual assault upon T.N.'s body so that the continuity of the act was broken. The prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). This is so even when the People rely on circumstantial evidence. *See Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence . . . is intrinsically no different from testimonial evidence. . . . In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."); *People v. McKinney*, 2016 Guam 3 ¶ 22 ("'[E]ntirely circumstantial' evidence is sufficient to support a guilty verdict." (quoting *United States v. Boskic*, 545 F.3d 69, 85 (1st Cir. 2008))).

[53]    As in *Diefenbach* and *Gilkey* discussed above, the jury could have reasonably inferred from the circumstantial evidence that T.N. was sexually assaulted before she was killed, *see Diefenbach*, 1996 WL 33360429, at *2; *Gilkey*, 2018 WL 2463114, at *4-5. Alternatively, a rational jury could have found that T.N. was both sexually assaulted and killed in a single, continuous act, or in a series of closely related acts. Sufficient evidence exists to prove the CSC convictions beyond a reasonable doubt under either view of the evidence, and the prosecution was not required to rule out every other hypothesis.

[54]    In summary: we reject the bright-line rule and join the majority of jurisdictions adopting the ongoing criminal assault rule in holding that it is CSC when a defendant both kills and sexually assaults a victim in a single, continuous act, or in a series of closely related acts, even if portions of the CSC, including penetration or sexual contact, occur once the victim has already been killed. The prosecution presented sufficient evidence from which the jury could have reasonably inferred

that T.N. was sexually assaulted before she was killed or that she was sexually assaulted and killed in a single, continuous act or in a series of closely related acts.

## B. The Matter Is Remanded to the Trial Court to Conduct an Included-Offense Analysis

[55] Both Acosta and the People advance arguments about which of Acosta's convictions constitutes an included offense. However, the trial court failed to conduct an included-offense analysis after the parties raised the issue, and so we remand for the trial court to do so.

[56] Title 9 GCA § 1.22 states:

> When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
>
> > (a) one offense is included in the other as defined in § 105.58 of the Criminal Procedure Code; . . .

9 GCA § 1.22(a) (2005). We have said and here reiterate:

> Although a defendant may be prosecuted for two crimes stemming from the same conduct, that defendant may not be convicted for both crimes. . . . Merger of the sentences is not a proper disposition . . . . [T]he proper disposition, under the circumstances of this case, is not merger of sentences but dismissal of the [offending] convictions.

*People v. Afaisen*, 2016 Guam 31 ¶ 52; *see also People v. Aguirre*, 2004 Guam 21 ¶ 18 ("[A] defendant may be prosecuted for multiple offenses arising from the same conduct if the conduct establishes the commission of more than one offense. However, if the offenses are included offenses, the defendant cannot be convicted of more than one offense.").

[57] It was not error for the trial court to send all charges to the jury or for the jury to return a guilty verdict on all charges.[6] The jury verdicts merely established the jury's findings on each

---

[6] In *People v. Aguirre*, we noted:

[P]roper jury verdict forms may prevent violations of [9 GCA § 1.22] by instructing the jury to consider lesser included offenses only if the defendant is found not guilty of the greater offense or

charge; the concern is whether the trial court entered convictions for both greater offenses and their included offenses, in violation of 9 GCA § 1.22(a). *See* 9 GCA § 1.22 ("[T]he defendant may be prosecuted for each such offense. He may not, however, be *convicted* of more than one offense . . . ." (emphasis added)); 8 GCA § 120.18 (2005) ("A judgment of conviction shall set forth the plea, the *verdict of findings*, and the *adjudication* and sentence." (emphases added)). Here, the trial court erred in failing to conduct an included-offense analysis when the parties raised the issue in their sentencing memoranda. *See generally* RA, tab 240 (Sent'g Mem., Aug. 10, 2020); RA, tab 242 (People's Am. Sent'g Mem., Aug. 12, 2020).

[58] In its final judgment, the trial court set forth the jury's verdicts and entered a "JUDGMENT OF GUILTY" for all charges and special allegations for which the jury found Acosta guilty. RA, tab 270 at 3-4 (Judgment).[7] It then sentenced Acosta to life in prison without the possibility of parole for Charge One (Aggravated Murder with the underlying felony of Burglary); twenty-five years of imprisonment to run consecutive to the above sentence for the Special Allegation attached to Charge One (Possession or Use of a Deadly Weapon in the Commission of a Felony); and twenty years of imprisonment to run consecutive to the above sentence for Charge Nine (Home Invasion). *Id.* at 4-5. The Judgment continues:

>   d. As to the remaining charges and attached special allegations, *any sentence would merge* with Charge One — AGGRAVATED MURDER (As a First Degree Felony) and its attached Special Allegation: Possession or Use of a Deadly Weapon in the Commission of a Felony; and
>
>   e. Defendant shall pay a fine of $10,000.00.

---

if the jury cannot unanimously agree that the defendant is guilty. This requires that the lesser included offenses be correctly identified.

2004 Guam 21 ¶ 23 n.3.

[7] But see footnote 1, above, with regard to the special allegation attached to Charge Twelve, Count Two.

*Id.* at 5 (emphasis added). That is: the trial court "convicted" Acosta of all charges and special allegations but "merged" them for sentencing. Assuming the merged offenses were included offenses, the trial court violated 9 GCA § 1.22 and our holding in *Afaisen* when it entered convictions for those offenses, even if no additional sentences were attributed to them. Instead, the trial court should have conducted an included-offense analysis and entered convictions only for those offenses which do not violate 9 GCA § 1.22. We vacate the judgment and remand so the trial court may conduct this analysis and enter judgment in conformity with 9 GCA § 1.22 and *Afaisen*.

### C. The Trial Court Did Not Err in Denying Acosta's Motion to Suppress

[59]    Acosta's third allegation of error is that the trial court should have suppressed any of his alleged statements made to the police on October 18, 2018,[8] about his involvement in the murder because the Guam Police Department overcame his will, thereby making his statements involuntary. *See* Appellant's Br. at 16-22. We disagree and affirm the Superior Court's denial of the motion to suppress.

[60]    According to Acosta, "Officer Santos clearly used his previous connections with [Acosta] and the prospect of needing to make amends with the 'Lord' to wrangle a confession," although he "purported not to threaten [Acosta] with Hell." *Id.* at 21. Acosta charges that their conversation "was not a discussion, but a manipulation of both [Acosta's] faith and the loss of his son" and that he was put "in such a mental state that any statements made were not of a 'rational intellect' and 'free will.'" *Id.* at 21-22 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)).

[61]    The People argue that the trial court correctly denied Acosta's motion to suppress. *See* Appellee's Br. at 21-29. They argue "[a]n appeal to the religious beliefs of a suspect in a criminal

---

[8] Acosta's brief suggests that the interview took place on October 19, 2019. Appellant's Br. at 16. The record says that it took place on October 19, 2018. *See, e.g.*, Tr. at 8 (Mot. Hr'g, May 16, 2019).

interrogation is not inherently coercive"; rather, a "court must look to the totality of the circumstances." *Id.* at 21. The People suggest that "Acosta was the prime driver of religious conversation during the interrogation" and state that "[a]t no point in time did the nature of Det. Santos's religious discussions with Acosta insinuate that failure to confess . . . would result in an eternity of damnation or condemnation by God." *Id.* at 22, 25. They say he was "repeatedly admonished of his right to remain silent," and "[a]fter Acosta prayed with Det. Santos, he was reminded of his Miranda rights multiple times." *Id.* at 25-26. Noting that he had been offered food, bathroom, and smoking breaks and was not handcuffed, they suggest that the only allegation of undue pressure was the appeal to religion. *Id.* at 25-26. Finally, the People argue that even if the statements are suppressed, there is sufficient other evidence for the jury to have convicted Acosta. *Id.* at 27-29.

[62]    Waiver of the Fifth Amendment privilege against self-incrimination, like other constitutional rights, must be knowing, intelligent, and voluntary. *Miranda*, 384 U.S. at 444; *People v. Sangalang*, 2001 Guam 18 ¶ 12. As we said recently in a different context:

> "[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." *People v. Guerrero*, 2017 Guam 4 ¶ 25 (second alteration in original) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A written waiver, however, creates a presumption of a voluntary, knowing, and intelligent decision. *United States v. Shorty*, 741 F.3d 961, 966 (9th Cir. 2013) (analyzing Federal Rule of Criminal Procedure 23(a)). The Ninth Circuit has repeatedly held that when there is a written waiver, and no additional facts negating the voluntary, knowing, and intelligent nature of the waiver, reversal is unnecessary. *Compare Shorty*, 741 F.3d at 966, *and United States v. Cochran*, 770 F.2d 850, 851 (9th Cir. 1985), *with United States v. Christensen*, 18 F.3d 822, 825-26 (9th Cir. 1994) (reversing because, despite written waiver, there was evidence defendant may have been mentally or emotionally unstable).

*People v. Perez*, 2021 Guam 18 ¶ 17 (alterations in original).

**[63]**     Acosta was read his *Miranda* rights and signed a waiver. Before Acosta made the statements, Detective Santos testified that he reminded Acosta of his right to remain silent. Despite the written waiver and reminder of his rights, Acosta asserts that his will was broken and overborne by the discussion of his deceased son and the conversation prompted by the biblical verse relating to confession and forgiveness hanging in the office in which he was questioned. Appellant's Br. at 21. He says that he was put into "an emotional state" or "a susceptible psychological state," by what he terms "objectively coercive police conduct." *Id.* at 21-22. He says the statements were involuntary. *See id.* at 22.

**[64]**     However:

> The test of voluntariness is not a "but-for" test. "[W]e do not ask whether the confession would have been made in the absence of the interrogation. Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all. . . . Thus, it can almost always be said that the interrogation caused the confession."

*United States v. Miller*, 984 F.2d 1028, 1032 (9th Cir. 1993) (alterations in original) (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)). "Instead, the question is whether police conduct exploits a defendant's condition to the extent that the defendant's 'will is overborne.'" *United States v. Crawford*, 66 F. Supp. 3d 1311, 1318 (D. Ore. 2014) (citations omitted); *see also Miller*, 984 F.2d at 1031 ("The pivotal question in each case is whether the defendant's will was overborne when the defendant confessed.").

**[65]**     The court considers the totality of the circumstances in determining the validity of a waiver of Fifth Amendment *Miranda* rights. *Perez*, 2021 Guam 18 ¶ 19 (citing *Sangalang*, 2001 Guam 18 ¶ 13); *People v. Chong*, 2019 Guam 30 ¶ 12. "A waiver is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Chong*, 2019 Guam 30 ¶ 12 (quoting *People v. Hualde*, 1999 Guam 3 ¶ 30).

**[66]** Other cases involving alleged religious coercion are instructive. In *United States v. Miller*, 984 F.2d 1028 (9th Cir. 1993), the Ninth Circuit found "no causal relationship" between defendant's confession and a conversation two days prior in which the Special Agent in Charge of the investigation—who was also a bishop in the Mormon church—discussed the spiritual need to confess and repent of wrongful acts. *Id.* at 1030-32. Although the defendant there stated during the suppression hearing that his confession had nothing to do with religion, he had become "tearful" after listening to the Special Agent. *Id.* at 1032. However, the court held that "'mere emotionalism and confusion' do not necessarily invalidate confessions." *Id.* (quoting *Sullivan v. Alabama*, 666 F.2d 478, 483 (11th Cir. 1982)).

**[67]** In *Welch v. Butler*, 835 F.2d 92 (5th Cir. 1988), the defendant was brought in for questioning and, after being advised of his *Miranda* rights, was told that the police had incriminating evidence against him. *Id.* at 93. The questioning officers left the room, and another officer, "a professed born-again Christian," went in because after listening to some of the evidence, he "apparently was concerned that [the defendant] misunderstood the nature of divine forgiveness." *Id.* They "discussed forgiveness and salvation and prayed together for about three hours. During this time, [the defendant] made incriminating statements." *Id.* When questioned, the officer who had prayed with him denied asking the defendant for a confession. *Id.* The original questioning officers later asked the defendant for an oral statement, which he provided, admitting to the crime. *Id.* As the Fifth Circuit held:

> There can be no doubt that [the defendant's] confession was not the product of will overborne by the police. One does not have to be devout to accept the fact that [defendant] was concerned about his salvation and about divine forgiveness. However, this concern existed before his conversations with [the praying officer]. At most, the police set up a situation that allowed [the defendant] to focus for some time on those concerns with a fellow Christian in the hope that his desire to be saved would lead him to confess. What coercion that existed was sacred, not profane.

*Id.* at 95.

[68]    In *Barrera v. Young*, 794 F.2d 1264 (7th Cir. 1986), the Seventh Circuit examined a case in which defendant was "psychologically prepared for interrogation, . . . [had] a lawyer seconds away, [and was subjected to] a 45 minute monologue including appeals to religion and reminders that the state's evidence is strong." *Id.* at 1270-71.  Although a slightly different context than this case, the court's commentary is instructive.  The Seventh Circuit held:

> [A] reminder to [the defendant] that if he believes in an afterlife he must consider the effect of his crimes and his failure to confess is again an appeal to [the defendant's] (very long run) self-interest.  It is difficult to describe an appeal to religious beliefs as unacceptable in our society; such appeals are common parts of life and need not cease at the door of the jail.  [The defendant] could have cut [the interrogator] short and said that he wanted to hear such appeals only from a priest or a friend, but he did not.  He found the appeal compelling, and a rhetorical device does not become illegitimate just because it is effective.

*Id.* at 1270; *see also United States v. Carignan*, 342 U.S. 36, 39-40 (1951) (deciding case on other grounds but noting, *inter alia*, that "[t]here were pictures of Christ and of various saints on the walls of the office in which the conversation occurred [and] [t]he Marshal evidently suggested to him that his Maker might think more of him if he told the truth about the crime," but stating that "the facts in this record surrounding the giving of the confession do not necessarily establish coercion"); *Berghuis v. Thompkins*, 560 U.S. 370, 375-76, 387 (2010) (holding that where, after almost three hours of silence, defendant answered in the affirmative to officer's question of whether defendant had asked God for forgiveness for shooting the victim, "[t]he fact that [the officer's] question referred to [the defendant's] religious beliefs also did not render [the defendant's] statement involuntary"); *Rodgers v. Commonwealth*, 318 S.E.2d 298, 302-304 (Va. 1984) (noting that defendant was not particularly susceptible to religious entreaties, but further collecting cases from various jurisdictions in which "religious remarks were viewed as only one part of the totality of the circumstances and were held not to be coercive"); *State v. Newell*, 132

P.3d 833, 844 (Ariz. 2006) (en banc) (holding that defendant's will was not overborne by detectives' references to "'get[ting] right with God,' confessing sins, and asking for forgiveness" (alteration in original)). *See generally Voluntary Nature of Confession as Affected by Appeal to Religious Beliefs*, 20 A.L.R.6th 479 § 3 (originally published in 2006) ("A confession is involuntary where the defendant's will was overborne. Because the determination of involuntariness is made on the basis of the totality of the circumstances, religious inducements to the defendant are just one factor in that determination."). *But see People v. Montano*, 277 Cal. Rptr. 327, 337 (Ct. App. 1991) (overturning conviction where, as part of totality of circumstances, including failure to cease questioning when defendant invoked his privilege to remain silent, officers' manipulation of defendant's religion was a "tactic[]" deliberately used to break defendant's will).

[69]     Here, the totality of the circumstances suggests that Acosta's statements were made voluntarily. According to testimony by the detectives, the interview began around 3:20 in the afternoon and took place in an office rather than an interview room. During the several hours he was there, Acosta was given the opportunity to use the restroom, offered food, invited to phone his lawyer and children, and allowed to smoke. Detective Mondia testified that the incriminating statements were made after the interview was over, when Acosta had been placed under arrest. At that point, the defendant "requested [Detective Santos's] assistance in helping him pray." Tr. at 53 (Mot. Hr'g, May 16, 2019). Detective Santos testified that the defendant was "weeping" and asked Detective Santos questions about his faith, at which time he "advised [Acosta] of his rights, that . . . he still has the right to stop answering." *Id.* at 71-72. According to Detective Santos, after Acosta made the statements about his involvement in the murder, Acosta "said he believe[d] his spirit to be set free." *Id.* at 78. Detective Santos stated that he had asked a follow-up question

regarding what Acosta meant by saying that he had gone "next door," *id.* at 50, but nothing in the record indicates that he made any threats, religious or otherwise, about what might happen if Acosta did not confess. The detectives specifically denied making any threats or promises, earthly or otherwise. *Id.* at 20-21, 51, 57. Although there are several references to the defendant weeping, and the discussion included difficult topics such as childhood challenges and the death of Acosta's son, Detective Santos denied that Acosta had become enraptured with the talk of faith or "put into a state where it seemed like he was unaware of his surroundings." *Id.* at 26, 28, 55, 57.

[70]     The testimony establishes that Acosta was granted the opportunity to eat, use the restroom, and smoke and was not threatened, religiously or otherwise, by the police. Although he became emotional during the conversation, Acosta initiated the discussion about religion and his son. The interview took place in the detectives' office, and he was advised multiple times of his rights. Under the totality of the circumstances, there is no indication he was coerced or that his will was overborne. The trial court did not err in denying the motion to suppress.

## D.  The Trial Court Should Have Made Evidentiary Findings Before Imposing the Fine

[71]     The $10,000 fine against Acosta must be reversed and remanded.

[72]     The trial court may sentence a person convicted of a crime to pay a fine or restitution in addition to serving a term of imprisonment. 9 GCA § 80.10(a)(6) (2005); *People v. Quinata*, 2010 Guam 17 ¶ 50 n.9. Title 9 GCA 80.52 states, in part:

> (b) The court shall not sentence an offender to pay a fine or make restitution in addition to a sentence of imprisonment or probation unless:
>
>> (1) the offender has derived a pecuniary gain from the offense; or
>
>> (2) the court believes that a fine or restitution is specially adapted to deterrence of the type of offense involved or to the correction of the offender.

> (c) The court shall not sentence an offender to pay a fine or make restitution unless the offender is or, given a fair opportunity to do so, will be able to pay the fine or restitution. The court shall not sentence an offender to pay a fine unless the fine will not prevent the offender from making restitution to the victim of the offense.

> (d) In determining the amount and method of payment of a fine or restitution, the court shall take into account the financial resources of the offender and the nature of the burden that its payment will impose.

9 GCA § 80.52(b)-(d) (2005).

[73]    In *People v. Quinata*, 2010 Guam 17 ¶¶ 50-55, this court held that section 80.52 requires an evidentiary hearing before imposition of a fine to determine whether the individual has the financial means to pay. "One of the purposes of an evidentiary hearing is to afford the defendant the opportunity to present evidence and argument on his ability to pay." *Id.* ¶ 55. With no stipulations or indications in the record that the trial court had considered the defendant's ability to pay, the court remanded the matter for a hearing on the subject. *Id.*

[74]    Here, Acosta argues that at sentencing, "the judge took none of [the statutorily required] matters into consideration in determining the payment of a fine in the amount of $10,000.00." Appellant's Br. at 23. Thus, he urges this court to "reverse the . . . fine and remand the matter for the trial court to make an appropriate determination with regard to a fine." *Id.* at 24. The People do not disagree. *Quinata*, they say, "makes clear that Acosta is entitled to a hearing on these issues," and so the People similarly urge the court to reverse and remand with instructions to conduct a hearing on the fine. Appellee's Br. at 29.

[75]    At sentencing, the trial court stated:

> I would also add, there has been payment of money for funeral expenses, for some hospital expenses, and to that extent, I'm determining that restitution would be appropriate in the amounts that have been indicated by the Government from the Criminal Injuries Compensation Fund and I'm adding on a fine of $10,000 appropriate for the costs incurred of course about trial and other things.

Tr. at 19-20 (Sent'g Hr'g, Aug. 12, 2020).  The Judgment simply states, "Defendant shall pay a fine of $10,000.00."  RA, tab 270 at 5 (Judgment).

[76]    We could find no indication that the trial court followed the requirements of 9 GCA § 80.52.  Neither the transcript of the sentencing hearing nor the Judgment contain any specific findings on the defendant's pecuniary gain, that imposition of a monetary penalty was specially adapted to deterrence or the correction of Acosta, that Acosta had the ability to pay, that a fine would not hamper his ability to make restitution, or that Acosta's financial resources had been considered.  *See* 9 GCA § 80.52(b)-(d).

[77]    We take this opportunity to clarify that in imposing a fine or restitution, a trial court must comply with *all* the provisions of 9 GCA § 80.52.  Because that was not done here, we vacate the fine and remand for a hearing.  As in *Quinata*, "[u]pon remand, the trial court can make any monetary adjustments that are required by the evidence presented."  2010 Guam 17 ¶ 55.

## V.  CONCLUSION

[78]    We **AFFIRM** the trial court's denial of what Acosta styled as his Motions *in Limine* and **AFFIRM** the trial court's denial of Acosta's Motion to Suppress.  We **VACATE** the Judgment and **REMAND** for the trial court to conduct an included-offense analysis, hold a hearing on the fine, and sentence accordingly.


|    /s/    | |    /s/    |
| :---: | --- | :---: |
| ROBERT J. TORRES | | KATHERINE A. MARAMAN |
| Associate Justice | | Associate Justice |


|    /s/    |
| :---: |
| F. PHILIP CARBULLIDO |
| Chief Justice |